

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. AP-77,086

### HOWARD WAYNE LEWIS, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL FROM CAUSE NO. 26518 IN THE 12TH JUDICIAL DISTRICT COURT WALKER COUNTY

**KEEL, J., delivered the opinion for a unanimous Court.**

## O P I N I O N

In November 2018, a jury convicted Appellant Howard Wayne Lewis of

capital murder for the strangulation death of his sixteen-month-old son committed

on July 24, 2013.[1] *See* TEX. PENAL CODE § 19.03(a)(8).  Based on the jury's answers to the punishment-phase special issues, the trial court sentenced Appellant to death. *See* TEX. CODE CRIM. PROC. art. 37.071, §§ 2(b), (e), (g).[2]  Direct appeal to this Court is automatic. Art. 37.071, § 2(h).  We affirm the trial court's judgment of conviction and sentence of death.

## I.  Sufficiency Challenges

Appellant challenges the sufficiency of the evidence at the guilt and punishment phases of trial.

## I.A.   Guilt-Phase Sufficiency Challenges

In points of error 2 and 3, Appellant claims that the trial court erred to deny his motion for instructed verdict and that the evidence is legally insufficient to support his conviction.  Since these are equivalent claims, we address them together.  *See Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996) (explaining that appellate courts treat complaints about trial courts' denials of motions for directed or instructed verdicts as challenges to sufficiency of evidence).  He argues that the evidence was insufficient because it was circumstantial and

---

[1] Unless otherwise noted, all dates in this opinion refer to 2013.

[2]  Unless otherwise indicated, all subsequent citations in this opinion to "Art.," "Article," or "Articles" refer to the Texas Code of Criminal Procedure.

failed to prove his motive and that the State relied on character assassination, a poorly established timeline, and inconclusive DNA test results to secure his conviction.

Appellant's arguments are without merit because legally sufficient evidence does not depend on types of evidence offered but on the big picture shown by the totality of the evidence. And the big picture here shows that on July 24 Appellant drove from Dallas to Huntsville where he beat his son's maternal grandmother to death with a hammer and hung his toddler son over a bathroom door where he slowly asphyxiated to death. Then he drove back to Dallas and tried to cover his tracks. But investigators established a timeline and found witnesses and surveillance footage that revealed Appellant's lies and supported the reasonable inference that he was the killer.

### I.A.1. Standard of Review

When reviewing the sufficiency of the evidence to support a conviction, we consider the evidence in the light most favorable to the verdict to determine whether, based on the evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 313 (1979); *Edwards v. State*, 666 S.W.3d 571, 574 (Tex. Crim. App. 2023). We are "restricted to guarding against the rare

occurrence when a fact finder does not act rationally," and we must "defer to the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (quoting *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010) (internal citations omitted)); *see Jackson*, 443 U.S. at 319. "The key question is whether 'the evidence presented actually supports a conclusion that the defendant committed the crime that was charged.'" *Morgan*, 501 S.W.3d at 89 (quoting *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)).

A culprit's identity and culpability may be proven by direct or circumstantial evidence. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009). Circumstantial and direct evidence are equally probative, "and circumstantial evidence alone can be sufficient to establish guilt." *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Circumstances showing guilt may include motive and opportunity to kill and the nature of the relationship between the victim and the defendant. *Nisbett v. State*, 552 S.W.3d 244, 265-66 (Tex. Crim. App. 2018). A defendant's efforts to hide evidence and his contradictory statements and dubious explanations to investigators also may also show guilt. *Guevara v. State*, 152

S.W.3d 45, 50 (Tex. Crim. App. 2004).

Each fact need not point directly and independently to the defendant's guilt if the cumulative force of the incriminating circumstances supports the conviction. *Hammack*, 622 S.W.3d at 914. Furthermore, the jury "may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when drawing inferences from the evidence." *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014).

**I.A.2. Evidence**

**a. Prelude**

Tiffany Crawford met Appellant in 2011 when they were both working as correctional officers at the Ellis Unit of the Texas Department of Criminal Justice (TDCJ) in Huntsville. A few months after they began dating, she got pregnant and learned that Appellant was in an intimate relationship with another woman. Tiffany then broke up with him and had minimal contact with him for the remainder of her pregnancy. After her son "A.L." was born in February 2012, she and A.L. went to live with her parents, Shanta and Robert Crawford. Tiffany returned to work part time, working ten-hour shifts on Tuesdays and Wednesdays, and Shanta retired to take care of the baby while Tiffany worked.

After A.L. was born, Tiffany's requests for child support caused conflict between her and Appellant. Eventually, she turned to the Attorney General's Office and secured a temporary order for $400 a month child support withheld from Appellant's paycheck beginning June 1 and health insurance for A.L. through Appellant's job.[3] Tiffany and Appellant came to hate each other after the order was entered.

On Tuesday, June 18, Appellant unexpectedly appeared at the Crawfords' home while Shanta was home with A.L. Shanta called Tiffany at work—an unusual occurrence—to tell her that Appellant was there, and she sounded "very concerned and worried." Tiffany thought that Appellant was there either to take her son or "harm somebody" and was so alarmed that she left work.

Meanwhile, Robert came home unexpectedly and discovered Appellant there. Robert thought Appellant's presence was "suspicious" and "unusual." He noted that his wife was "very concerned"—she expressed to Robert that Appellant was "up to something"—and seemed relieved that Robert had come home unexpectedly. Appellant was gone by the time Tiffany arrived, and Shanta told her that she and Appellant had had a heated conversation.

---

[3] In his reply brief, Appellant disputes Tiffany's understanding of the health-insurance aspect of the temporary order, State's Exhibit 28.

Sometime in July, Tiffany learned that A.L. still was not covered by Appellant's insurance, and she called him about it on July 23. In a heated conversation, he told her that he would not add A.L. to his coverage regardless of the court order.

**b. July 24**

Shortly before 5:00 p.m., Robert arrived home and noticed water running out of the house. Inside he found Shanta dead on the kitchen floor, her body lying in a pool of water and blood. The faucet was running onto the counter and overflowing to the floor. Robert then found sixteen-month-old A.L. dead in the bathroom, hanging by the neck from a twine rope looped over the bathroom door and tied to the doorknob. Robert called 911 at 4:46 p.m.

A.L. was dressed in sandals and a baseball-themed onesie that said "Daddy's Team" on the front. Tiffany testified that she and her mother never put sandals on A.L., and Appellant was the only one who did.

Tiffany had just left work at 6 p.m. when she was summoned back to the warden's office and told that A.L. was dead. She was then taken to the sheriff's office and told of her mother's death. She tried to call Appellant to tell him about A.L., but got no answer, and so she texted him the news. Meanwhile, he had texted her at about 3:30 pm about visiting A.L.—a message that Tiffany did not see until

after her shift because cell phones are not allowed on her job.

Celestina Rossi, a Montgomery County crime scene investigator who assisted the Walker County Sheriff's Office (WCSO) with the investigation, testified that the blood patterns in the kitchen indicated at least two different "spatter event" locations that suggested that Shanta was struck while standing at the sink and then while on the floor. With chemical development, Rossi found the outline of a hammer in the blood on the kitchen floor and some shoe impressions. In Shanta's autopsy, Rossi saw linear injuries on the back of Shanta's head that were consistent with a clawed object like a pry bar, hammer, or gardening tool.

There were no signs of forced entry, but the master bedroom had been "tossed" as if to simulate a home invasion. A firearm in plain view and $2,100 cash in a drawer were left behind. The only missing items were kitchen towels and a white clothes basket. A pile of clothes was on the bathroom floor.

## c. Autopsies

The medical examiner testified that Shanta died of blunt force trauma to the head and suffered multiple fatal injuries, including a depressed skull fracture, that were consistent with blows from a hammer. A.L.'s autopsy showed that he died of asphyxia due to hanging. The medical examiner explained that the toddler's death would not have been instantaneous; it seconds to minutes to lose consciousness,

and death takes about four to six minutes.

### d. Appellant's Interactions with Law Enforcement

At about 10:00 p.m. on July 24, law enforcement officers went to the home that Appellant shared with his girlfriend or fiancée Sharon Curry Lynch to notify him of A.L's death. Texas Ranger Trace McDonald knocked on the door and "[p]retty instantly" heard screaming from inside the home. Lynch opened the door, and McDonald saw Appellant lying on the floor "kind of flailing around" apparently reacting to a text message. His "crying" initially lasted about 10 minutes, but "there were no tears ever," which McDonald thought was "strange." Appellant told McDonald that he had been home all morning but went to Veronica "McGilbrea's" house in the afternoon and took a nap, and then he went to Catrina Butler's house.[4]

The next day, July 25, WCSO Detective Greg Williams and Texas Ranger Brandon Bess interviewed Appellant at his home. He claimed that on July 24th he had stayed in the Arlington area, driving his green Infiniti SUV to several places, including the homes of his girlfriends, Veronica Sanders and Catrina Butler. The police interviewed Sanders, her son, and Butler, and they confirmed that Appellant

---

[4] "McGilbrea" does not appear elsewhere in the record but seems to be another name for Veronica Sanders.

had visited their homes on the day of the murders.

On July 27th, Appellant was interviewed on video by Detective Danny Billingsley at the WCSO, and during the interview Appellant asked to speak with Detective Williams off camera. Williams took Appellant to a separate room where Appellant told him on an audio recording that a TDCJ inmate named Roderick Mask had threatened him and could have targeted A.L. because A.L. was a prison guard's son. The two men returned to the interview room, and Williams had Appellant repeat the information about Mask to Billingsley. After Williams left the interview room, Appellant soon admitted having lied to Williams to get a break from questioning.[5] At one point, Billingsley showed Appellant a crime scene photograph of A.L. hanging on the bathroom door and observed that Appellant had "[n]o reaction."

On September 15, 2013, police interviewed Appellant at his attorney's office. For the first time, Appellant mentioned a trip to Hutchins State Jail the morning of July 24, deviating from his earlier story about having slept late that day. He again said that he had been driving his green Infiniti SUV on July 24.

e. Timeline Evidence

---

[5] Law enforcement still followed up on the information and discovered that Mask had been in the Grayson County Jail when Shanta and A.L. were murdered.

Police reviewed the incoming calls identified on the Crawfords' land-line phone and discovered that Edna Gordon had spoken with Shanta on the morning of July 24th. Gordon called Shanta around 9:30 a.m. and got no answer, but Shanta returned Gordon's call, and the two women spoke for "no more than fifteen minutes." Gordon's phone showed that her call with Shanta began at 10:01 a.m.

Walker County deputies calculated the mileage and time required to drive from the Crawfords' Huntsville home to Sanders's Dallas house by driving the route in a Chevrolet Impala, which had the same motor type as a Malibu. The drive to Sanders's house was a distance of 176.4 miles and took two hours, twenty-six minutes, and forty-six seconds. The return trip, a distance of 175.9 miles, took two hours, seventeen minutes, and forty-two seconds. These drive times corresponded to a round trip Appellant had made the weekend of July 5 to take A.L. to and from Dallas for a visit.

Sergeant John Davila reviewed Appellant's cell-phone records and noted a gap in cell-tower hits lasting five hours, thirteen minutes, and twenty-eight seconds on July 24. The records reflected a tower hit in Dallas County and then, after the five-hour gap, a hit just outside of Fairfield which is located along Interstate 45 between Huntsville and Dallas. The tower hits then continued north toward Dallas. Further review of Appellant's cell phone records showed a similar gap on

June 18, 2013. No other gaps appeared between June 1 and August 1, 2013. Ordinarily, his phone was in "constant" use.

Breck McDaniel, a cell phone expert and former homicide investigator for the Houston Police Department, reviewed Appellant's cell phone records and the data extracted from the phone. He explained that cell phones communicate with cell towers, and that phone data can determine the approximate area where a cell phone is located. He observed that on July 24 the call activity registered to cell sites in the Dallas area showed a gap in Appellant's cell phone activity (that is, no cell site information) between 7:46:58 a.m. and 12:57:28 p.m.—a period of five hours, ten minutes, and thirty seconds.[6]

McDaniel analyzed the distance and drive times from Appellant's last known cell site location in the Dallas area to the Crawfords' home in Huntsville as well as the distance from the Crawfords' home to the first cell tower site after the gap. Using Google Maps and the average drive time represented in that application, he calculated the approximate drive time for the round trip between cell tower hits to be four hours and fifty-six minutes. The difference between the round-trip drive-time estimate and the activity gap in Appellant's cell phone records was about

---

[6] McDaniel explained that the three-minute difference between his time calculation and that of Deputy Davila was attributed to the length of the last call made before the gap, which was 178 seconds (two seconds shy of three minutes).

fifteen minutes (fourteen minutes and thirty seconds). McDaniel concluded that this gave Appellant enough time to have committed the two murders at the Crawfords' home.

**f. Appellant's Alibi Efforts: Blue Malibu and Earache**

<u>The Blue Malibu</u>

Kristen Winfrey, a Huntsville resident whose family lived down the road from the Crawfords, noticed a car parked in the Crawford driveway across the carport on July 24. He had never seen it before, and it had large Texas Tech stickers on the back. This information prompted officers to return to Dallas to re-interview Catrina Butler who owned a dark blue Chevrolet Malibu with Texas Tech decals prominently displayed on the back.

According to Butler, she and Appellant traded cars on July 23 when he offered to change the oil in her car. As a result, she drove Appellant's green Infiniti SUV to work on July 24 while Appellant had her Malibu. Appellant returned her Malibu to her house at about 3:00 p.m. on July 24 without having changed its oil.

Appellant's fiancée Sharon Lynch confirmed that on July 23 Appellant parked a blue Chevy in their driveway. When she asked him whose car it was, Appellant told her it belonged to a co-worker and that he was doing an oil change for "him."

On July 24 around lunchtime, Appellant called Veronica Sanders, an on-and-off girlfriend, to tell her that he was at her house. She was at work and had not been expecting him. When shown a photograph of Butler's car at trial, Sanders testified that she did not recognize it or know who it belonged to. Her adult son, Justin, saw Appellant arrive in the house on July 24 and then heard Appellant on the phone and heard the front door open and close repeatedly. According to Justin, Appellant left the house after less than hour.

A neighbor's video footage showed Appellant pulling Butler's car into Sanders's driveway at about 12:45 p.m. on July 24 and then immediately backing out and parking in front of the house. He remained in the car for about eight minutes and then went inside the house carrying something. Twenty minutes later, he came out of the house wearing different clothes. He returned to Butler's car and sat in it for about ten minutes before going back inside the house. He then went in and out of the house several times, at one point carrying something like a white trash bag to Butler's car. He left Sanders's house at approximately 2:46 p.m. carrying what appeared to be a full white trash bag.

The Earache

Around 1:00 p.m. on July 24th, Sharon Lynch received a call from Appellant while he was at the house and she was at work. He asked her to make him a

doctor's appointment because "his ear was still bothering him." She used her work phone to call the doctor's office and get Appellant an appointment at 2;15, but he turned it down, saying "that's not enough time for me to get dressed and go over there," so Lynch made the appointment for the next day.

### I.A.3. Analysis

Viewed in the light most favorable to the verdict, the evidence showed that Appellant killed A.L. He had a motive—to avoid responsibility for his son—and the opportunity; he lied to investigators about his activities and whereabouts on the day of the murders; he was driving Butler's car that day, and a car just like it was parked outside the Crawford's house on July 24. His phone was turned off only twice between June 1 and August 1—on July 24 and June 18—and those intervals corresponded to the round-trip, drive time from his home to the Crawfords' house. And he made an unannounced visit to the Crawfords' house on June 18 while Shanta and A.L. were home alone. Based on this evidence, a rational jury could find beyond a reasonable doubt that Appellant was guilty.

We overrule points of error 2 and 3.

### I.B. Sufficiency of Evidence Supporting Future Dangerousness

In point of error 142, Appellant argues that the evidence is legally insufficient to support the jury's finding of future dangerousness. *See* Art. 37.071, § 2(b)(1).

**I.B.1.  Standard of Review**

Sufficiency to support a future dangerousness finding depends on evidence at both the guilt and punishment stages of trial and must be viewed in the light most favorable to the verdict.  *Daniel v. State*, 485 S.W.3d 24, 31 (Tex. Crim. App. 2016); *see Jackson*, 443 U.S. at 319.  We ask whether any rational trier of fact could have believed beyond a reasonable doubt that there was a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society.  *Buntion v. State*, 482 S.W.3d 58, 66 (Tex. Crim. App. 2016).

The jury is entitled to consider the evidence in both the guilt and punishment stages in deciding whether such a probability exists.  Relevant considerations include the circumstances of the offense and the events surrounding it; lack of remorse; premeditation; deception and manipulation; extraneous acts of violence; a prior criminal record and its severity; the defendant's age and personal circumstances at the time of the offense; psychiatric evidence; character evidence; and an escalating pattern of violence.  *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987); *see Wardrip v. State*, 56 S.W.3d 588, 595 n.7 (Tex. Crim. App. 2001).

**I.B.2.  Analysis**

Here, the circumstances of the offense alone were sufficient. He slowly strangled to death his sixteen-month-old son and bludgeoned to death the child's grandmother. It seems he premeditated these brutal murders, having (1) made a practice run or false start of the project on June 18, (2) traded cars with Butler on July 24, (3) turned his phone off on both June 18 and July 24, and (4) lied to Lynch about staying home with an earache on July 24.

Other relevant considerations supported the finding of future dangerousness, too. They include the following:

- Lack of remorse:

    he had margaritas with Butler after returning her car to her; then he had a seemingly normal night of talking TV-watching with his fiancée;

    on July 25, 26, and 27 he talked with a friend about "girls and sports" but did not mention A.L.'s death;

    he was sexting with Pamela Burrell the day after A.L.'s funeral;

    he bragged about the murders to a cell-mate, Greg Cunningham, saying that he would "get away with it" and the police were "too stupid to catch [him]" and that Tiffany got pregnant to trap him into paying her money;

- History of manipulation and deception:

    he carried on intimate relationships with several women at once but kept them in the dark about one another and his various children; most of them did not know where he lived;

Tiffany testified that Appellant provided for A.L. only if she was "nice" to Appellant; after he moved to Dallas he would provide for A.L. only if Tiffany begged him to or slept with him;

- Physical and emotional abuse of family members:

Lynch testified that Appellant choked her during an altercation;

Appellant's adult son Darian Lewis testified that when he went to Connecticut to live with Appellant beginning at age 11, Appellant frequently beat Darian and Darian's sister with a belt, cable wire, or cord; he constantly threatened to send them back to Jamaica to live in poverty with their mother; and in fact he did send them back at one point with no notice to their mother;

after Darian was returned to Appellant and suffered more abuse at his hands, he ran away after Appellant dropped him off at the airport with a ticket to Jamaica; Darian then stayed in foster care until age 18; records from the Connecticut Department of Children and Families corroborated Darian's testimony;

Darian had his last contact with Appellant in 2010 when Appellant threatened to drive from Texas to Connecticut to shoot Darian because Darian had objected to the way Appellant had spoken to Darian's mother;

- Misbehavior in jail while awaiting trial:

searches of Appellant's cell yielded razor blades and a weapon fashioned from a toothbrush, paper clip, and thread;

after the razor blades were found, Appellant started talking about killing people and told Cunningham that "he gets angry and blacks out" and "nothing would save [Cunningham] but the jailors[;]"

one time Appellant got "loud and aggravated" and started banging on windows when he was not immediately allowed to use a phone;

he targeted one of his prosecutors, instructing his ex-wife on the phone in coded language to get pictures of the prosecutor's one-year-old son and to research her family; a search of the ex-wife's Tennessee home yielded (1) a letter from Appellant instructing the ex-wife how to surreptitiously send him a sewing needle and (2) a voodoo doll bearing the prosecutor's name with a pin stuck in its stomach;

- Experience as a former TDCJ correctional officer:

  Melodye Nelson, a regional Director with TDCJ, testified that Appellant's knowledge of and experience working in the prison system were a cause for concern;

- Psychological testimony:

  clinical and forensic psychologist Dr. Darrel Turner testified that some of Appellant's behaviors aligned with characteristics on the Hare Psychopathy Checklist and that Appellant's personality had a "high degree" of antisociality; Turner testified, "We don't fix personality disorders[,]" many people with antisocial characteristics are violent, and violence and antisociality correlate; and Appellant's antisocial behaviors seemed to be "escalating[.]"

Appellant suggests that his mitigation evidence rendered the evidence of future dangerousness legally insufficient, but the standard of review forecloses re-weighing of evidence on appeal. *Jackson*, 443 U.S. at 318–19. He also suggests that his imprisonment would keep him away from children and so prevent any future dangerousness. This suggestion, too, contradicts the standard of review,

and even if it did not, it ignores his murder of Shanta and TDCJ's employment of women. He cites his good behavior in jail, but that would not preclude a finding of future dangerousness. *See Hunter v. State*, 243 S.W.3d 664, 673 (Tex. Crim. App. 2007). And anyway his behavior wasn't that good.

We overrule point of error 142.

## II. CHANGE OF VENUE

In point of error 4, Appellant contends that the trial court erred in denying his motion to change venue. This point is without merit.

### II.A. Standard of Review

A trial court may grant a change of venue if the defendant establishes that "there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial." Tex. Crim. Proc. Art. 31.03(a). When a defendant seeks a change of venue based on publicity about the case, he must show that the publicity was "pervasive, prejudicial, and inflammatory." *Tracy v. State*, 597 S.W.3d 502, 509 (Tex. Crim. App. 2020) (quoting *Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007)). "Widespread publicity by itself is not considered inherently prejudicial." *Id.* The defendant must demonstrate "an actual, identifiable prejudice attributable to pretrial publicity on the part of the community from which members of the jury will

come." *Id.* (quoting *DeBlanc v. State*, 799 S.W.2d 701, 704 (Tex. Crim. App. 1990)) (internal quotation marks omitted). News stories that are accurate and objective are generally considered not to be prejudicial or inflammatory. *Gonzalez*, 222 S.W.3d at 451.

We review a trial court's ruling on a motion for a change of venue for abuse of discretion and will uphold it if it is within the zone of reasonable disagreement. *Tracy*, 597 S.W.3d at 509–10. The two primary methods of determining whether publicity is pervasive are: (1) a hearing on the motion to change venue, and (2) the testimony of prospective jurors at voir dire. *Id.* at 510.

## II.B. Background

Appellant was indicted in Walker County in November 2013. In late June 2016, he filed a motion to change venue based on prejudicial pretrial publicity, attaching affidavits of two local criminal defense attorneys. The following month, he filed an amended motion for change of venue, attaching the same two affidavits. The State filed a response to Appellant's motion, attaching affidavits of eleven Walker County residents. The trial court conducted a hearing on the motion on August 24, 2016.

At the hearing, Appellant offered testimony from Frank Blazek and J. Paxton Adams, the two criminal defense attorneys who had provided the affidavits

supporting his motion.[7] Appellant also provided testimony from Cody Stark, the editor of the local newspaper, *The Huntsville Item*.

Blazek testified that he was familiar with the case from "the media and gossip on the street." He thought the community had formed an opinion that Appellant was guilty. He did not think Appellant could get a fair trial if "fair" means "a shot at getting life." He believed that a Walker County jury would be predisposed to find in favor of the death penalty because this case involved someone killing an infant child and the grandmother, and "that's a real bad case." However, he acknowledged that he did not know the details of what happened in this case.

Blazek described the media coverage as "extensive" and thought it "probably" affected the jury pool. He had seen stories about the case in *The Huntsville Item*, on television news, and on the Internet. He could not identify any particular story that stuck in his mind. On cross-examination, Blazek said that most of the conversations he had had about this case were about the nature of the crime. He could not recall a specific conversation or name any individual with whom he had spoken about the case. Blazek agreed that most of the coverage

---

[7] When Blazek provided the affidavit and testified at the hearing, he was not representing Appellant. He later went to work for the Regional Public Defender's Office and became co-counsel for Appellant.

occurred at the time of the murders and that "there's been less coverage as time has passed."

Adams testified that he had heard about this case from his mother, who called him the day after the murders because she had worked with Shanta Crawford. Although Adams did not know Shanta personally, he expressed that she was a "very, very beloved woman in this community." He believed that the community feelings about Shanta would "negatively impact" Appellant's ability to get a fair trial in Walker County. Adams testified that because he is a lawyer, people often asked him about the case, and he had discussed the case with "other people." He felt that people had already formed an opinion that Appellant was guilty. However, Adams also stated that it did not appear that people knew anything about the facts of the case.

Adams said that when the murders happened, "it hit the paper, the front page." But he acknowledged that the initial stories were about looking for leads. From the media coverage, Adams recalled the fact that "a well-known lady [was] found killed in her home." He was not sure if the media coverage included that the baby was hanged. Adams expressed his opinion "as a defense attorney in this community" that Appellant could not receive a fair trial in Walker County. On cross-examination, Adams expressed that "just the nature of the offense had made

[people] conclude that [Appellant's] a horrible person and he is guilty" and that "it's presupposed he did it." Adams agreed, however, that it had "been a while" since he had seen anything about the case in the media.

Stark testified that *The Huntsville Item* is the largest newspaper in Walker County with a print circulation of about 5,000 to 6,000 and a Facebook following of about 10,000 to 11,000. He said that the paper published "at least a dozen" articles on the case. This case was also included in an article counting down the top ten stories of 2013 in Huntsville; the story of the double-homicide in the Crawfords' home ranked number one.

During Stark's testimony, Appellant offered re-prints of fifteen articles published in the newspaper. Stark reviewed the headlines, article placement, and the dates of publication. On cross-examination, Stark confirmed that the last article was published on November 11, 2014, and agreed that the bulk of the articles were published within the first few weeks after the murders. On re-direct, Stark testified about Facebook comments on an online article, which he said had "reached" 5,118 people.

The State asked the trial court to take judicial notice of the eleven affidavits of Walker County residents attached to the State's response to Appellant's motion for change of venue. In addition, the State offered the live testimony of three of

those Walker County residents: David Ward, Kenneth Huggins, and Lovie Willis.

Ward, the owner of a "furniture flooring store" in Huntsville, had lived in Huntsville for fifty-two years. Ward said that he only knew of Appellant from the newspapers. He testified that he had contact with "a lot" of people in his business, and, based on his interactions with community members, he believed Appellant could get a fair trial in Walker County. On cross-examination, Ward testified that in the three years since the murders, he had not had any conversations about the case.

Huggins, the pastor of a local church, had lived in Walker County for twenty-five years. He testified that he had many conversations with people in different settings, and he believed that Appellant could get a fair trial in Walker County. He had seen media reports on the case but could not recall specific information.

Willis, a lifelong Walker County resident who lived in the neighborhood where the murders occurred, testified that she believed that Appellant could get a fair trial. Willis knew the Crawford family and had been a classmate of Shanta Crawford. Even so, Willis had not had many conversations about the case. She had had some conversations "when it happened" but maybe only about five times in the previous year. On cross-examination, Willis agreed that Shanta was a well-known and beloved figure in the community. She expressed that she had not

formed an opinion about Appellant's guilt because she did not know the facts of the case.

After the testimony, the trial judge discussed with Appellant's counsel the possibility of submitting a video of coverage from a television news station and agreed to allow it. [8] The court expressed its intent to carry the motion with the case and revisit the venue issue if necessary.

In late August 2018, after the start of voir dire, Appellant filed a motion to reconsider his motion for change of venue. Appellant offered a print-out of an online article published the week before on *The Huntsville Item* website. He argued that the "additional publicity" combined with the jurors' questionnaire answers warranted a change in venue. The court denied the motion.

## II.C. Analysis

Appellant asserts that stories "about the hanging death of 18 [sic] month old [A.L.], and the bludgeoning death of his grandmother, Shanta Faye Crawford" were "graphic and repetitive - appearing so many times, it claimed the top spot as the # 1 story of 2013." But "[t]he mere existence of media attention or publicity is not enough, by itself, to merit a change of venue." *Gonzalez*, 222 S.W.3d at 449; *see Renteria v. State*, 206 S.W.3d 689, 709 (Tex. Crim. App. 2006) (explaining that

---

[8] We do not find a video of television news coverage in the record.

"jurors do not have to be totally ignorant of the effects and issues of a particular case"). Moreover, Appellant mischaracterizes the publicity.

The record includes photocopies of fifteen news articles from *The Huntsville Item* as they appeared in print, as well as one print-out of Facebook comments responding to an online article, and one print-out of an online article. The publication dates range from the day after the bodies were found through the beginning of jury selection. Eleven of the print articles were published in 2013, three were published in 2014, and one was published in 2018. *See Bell v. State*, 938 S.W.2d 35, 46 (Tex. Crim. App. 1996) (finding it significant that majority of news coverage about which defendant complained occurred years before trial).

The first nine articles include no information about the murders other than the victims' names; the articles repeatedly state that the cause or manner of death "has not been released" or "has not been made public." Details about the murders appear only in four later articles, beginning with the article reporting Appellant's arrest. These articles reported that Shanta Crawford had been "violently beaten to death with a blunt object," A.L. had "died of asphyxiation," "the killer had left [A.L.'s] body 'in a hanging position on an interior door' inside the home," and "analysis of DNA evidence found on an object left at the scene was used to link" Appellant to the homicides. These articles are not "graphic" stories

about the killing.

Appellant takes issue with the reporting about the DNA evidence, asserting that "*The Huntsville Item* incorrectly reported that Defendant's DNA connected him to the rope used to kill [A.L.]. The DNA evidence in this case was 'inconclusive.'" But the articles referencing DNA did not mention the rope involved in A.L.'s hanging. Further, the record indicates that initial DNA testing suggested that Appellant's DNA profile could not be excluded from a DNA profile mixture found on the rope. Only after DPS re-analyzed evidence using updated protocols for mixtures was it determined that Appellant's DNA profile fell within the "inconclusive" range.[9]

The hearing evidence supports the trial court's implied conclusion that the media coverage was not pervasive, prejudicial, or inflammatory and that it did not permeate the Walker County community to such an extent that a fair and impartial trial would be impossible. Most of the articles did not provide detailed information about the murders. Those that did gave minimal information and provided

---

[9] As Appellant's counsel explained to the trial court, the initial September 2013 DNA lab report "would indicate to the reader that the DPS analyst, back in 2013, concluded that it was highly likely, with almost substantial probability, that the defendant's DNA was found on various swabs, which would connect him with the murder case, swabs from the rope." However, later DNA reports in 2016 indicated that Appellant was either excluded as a contributor or the results were "inconclusive" as to some items, including the rope.

accurate and objective details of the causes of the victims' deaths. Further, there was no estimate of how many people in Walker County received or read those articles. And no evidence showed that members of the Walker County jury pool made the Facebook comments on the one online article.

Appellant failed to demonstrate "an actual, identifiable prejudice attributable to pretrial publicity on the part of the community from which members of the jury [would] come." *See Tracy*, 597 S.W.3d at 509. Accordingly, the trial court acted within the zone of reasonable disagreement in denying Appellant's motion for change of venue based on prejudicial pretrial publicity. *Tracy*, 597 S.W.3d at 509–10.

We overrule point of error 4.

## III. SPEEDY TRIAL

In point of error 1, Appellant asserts that the trial court erred in denying his motion to dismiss for lack of a speedy trial. This point is without merit.

### III.A. Standard of Review

"The Sixth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, guarantees a speedy trial to an accused." *Balderas v. State*, 517 S.W.3d 756, 767 (Tex. Crim. App. 2016) (quoting *Gonzales v. State*, 435 S.W.3d 801, 808 (Tex. Crim. App. 2014)); *see* U.S. CONST.

amends. VI, XIV; TEX. CONST. art. I, § 10.  The right to a speedy trial attaches when a person is arrested or formally charged. *Henson v. State*, 407 S.W.3d 764, 767 (Tex. Crim. App. 2013).  We measure the delay from that point.  *Barker v. Wingo*, 407 U.S. 514, 530 (1972).  "In general, courts deem delay approaching one year to be 'unreasonable enough to trigger the *Barker* enquiry.'"  *Balderas*, 517 S.W.3d at 768 (quoting *Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003)).

We analyze a speedy trial claim by applying a fact-specific balancing test. *Barker*, 407 U.S. at 530.  We weigh and balance four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the prejudice inflicted by the delay.  *Id.*  No single factor is necessary or sufficient to establish a violation of the right to a speedy trial; instead, we must weigh the conduct of the prosecution and defendant using a balancing test of the four factors. *Id.*  The State must justify the length of the delay while the defendant must prove the assertion of the right and show prejudice.  *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008).  We apply the four factors "with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed."  *Id.* at 281.

Review of the factors necessarily involves factual determinations and legal conclusions, but the balancing test is a purely legal question. *Balderas*, 517 S.W.3d at 768. We apply a bifurcated standard, reviewing the trial court's determination of historical facts for an abuse of discretion but reviewing de novo the court's application of the law to the facts. *Id.*

### III.B.1. Analysis: Length of Delay

Appellant was indicted on November 14, 2013, and jury selection began on August 20, 2018—a delay of four years and nine months. The State concedes, and we agree, that this delay triggers the *Barker* inquiry. *See Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992) (explaining that in this threshold context, "presumptive prejudice" "simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry").

The length of the delay weighs in favor of finding a speedy trial violation.

### III.B.2. Analysis: Reason for Delay

Once the length of time is found to be presumptively prejudicial, the State bears the burden of justifying the delay. *Cantu*, 253 S.W.3d at 280. Different weights are assigned to different reasons for delay. *Barker*, 407 U.S. at 531. A purposeful delay to hamper the defense weighs heavily against the State. *Id.* More neutral reasons, such as negligence or crowded dockets, weigh less heavily. *Id.*

Valid reasons, such as a missing witness or delay caused by plea negotiations, do not weigh against the State at all. *Id.* Finally, delay attributable to the defense weighs against a defendant's speedy trial claim. *Hopper v. State*, 520 S.W.3d 915, 924 (Tex. Crim. App. 2017). Such delay may constitute a waiver of the speedy trial claim. *State v. Munoz*, 991 S.W.2d 818, 822 (Tex. Crim. App. 1999); *see Barker*, 407 U.S. at 529.

Appellant argues that he "was prevented from having a speedy trial due to the State's delay in obtaining DNA testing and analysis even though the State saw fit to indict [him] in 2013." His argument oversimplifies and mischaracterizes the record which shows delays caused by (1) the defense and (2) a change in DNA testing protocols but no delay caused by the State for the purpose of hindering the defense.

The defense caused delay in three ways: changing counsel, repeatedly requesting DNA testing, and accommodating defense counsel's busy trial schedule.

Initially, Appellant was represented by the Regional Public Defender's Officer ("RPDO"), but he hired counsel at some point. That attorney withdrew a year after the indictment when Appellant expressed dissatisfaction with his representation. The trial court then re-appointed the RPDO. So some of the delay is attributable to Appellant and his decision to dismiss his retained attorney.

Further, Appellant sought additional DNA testing of items submitted to the lab and did so on multiple occasions. The additional testing was delayed due to a change in DPS's protocols for evaluating DNA mixtures to comport with new scientific standards. The implementation of the new protocols required the development, installation, and application of new software, retraining analysts on the new software, possibly retesting materials, and re-analyzing or at the very least reinterpreting DNA results. Given the continuing delay caused by the change in protocols the trial court clarified on the record that both parties wanted the DNA testing done. Appellant explicitly stated that he "[wasn't] going to abandon [his] rights to retest it." The delay resulting from the DNA testing is attributable to both parties, but more so to Appellant because he initially and repeatedly sought further DNA testing.

Another delay of trial was caused by defense counsel's busy trial schedule. At one point Appellant's counsel sought a delay of Appellant's trial due to a scheduling conflict with another capital murder case the attorneys were handling.

In sum, the record contains no evidence of deliberate attempts by the State to hamper Appellant's defense by delaying trial. Instead, the delay was due to Appellant's changing counsel twice, post-indictment DNA testing and retesting,

and accommodating defense counsel's trial schedule. The reason-for-delay factor does not weigh in favor of finding a speedy trial violation.

### III.B.3.  Analysis: Assertion of the Right

"The defendant has no duty to bring himself to trial; that is the State's duty. But a defendant does have the responsibility to assert his right to a speedy trial." *Cantu*, 253 S.W.3d at 282.  "Therefore, the defendant's assertion of his speedy-trial right (or his failure to assert it) is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Id.*  Although a defendant's failure to assert the right does not amount to its waiver, the failure makes it difficult to prove he was denied a speedy trial. *Barker*, 407 U.S. at 532. The failure indicates strongly that the defendant did not really want a speedy trial and that he was not prejudiced by the lack of one. *Dragoo*, 96 S.W.3d at 314.  And the longer the delay becomes, the more heavily the defendant's inaction weighs against his claim. *Balderas*, 517 S.W.3d at 771.

Appellant claims that he "always asserted his right to a speedy trial," but he cites to no such assertion in the record; he cites only defense counsel's comments in support of his motion to dismiss filed almost five years after indictment and a week after voir dire began.  His motion sought dismissal based on the alleged failure of the State to timely provide exculpatory evidence—a July 2016 DNA report and a

police report indicating that Kristen Winfrey had given conflicting accounts of the approximate time he saw a car similar to Butler's at the Crawfords' home. Appellant asserted to the trial court that he would have sought a speedy trial sooner had he known of or received this exculpatory evidence, but the record shows otherwise.

First, Appellant did not assert his right to speedy trial when he received the DNA report on September 27, 2017.  Instead, on October 20, 2017, he filed a motion to dismiss because the indictment was based on "false, misleading and inaccurate evidence[.]"  The motion to dismiss never asserted the right to a speedy trial.  In fact, after receiving the exculpatory DNA report, Appellant waited eleven more months—until after the start of jury selection—to file his motion to dismiss for lack of a speedy trial.

Second, Appellant did not assert his speedy trial right when he learned of Winfrey's conflicting statements.  Assuming he learned of the conflicting statements on April 6, 2018, as his motion alleged, he waited two months to take action, and that action was not speedy trial motion but a motion to suppress Winfrey's testimony.  Another ten weeks passed and voir dire had begun before he

sought dismissal for lack of speedy trial.[10]

At no point before that did Appellant ask for a trial setting, even upon receipt of the exculpatory evidence that he claimed would have prompted him to demand a trial if he had received it sooner. Instead, he filed motions to dismiss and to suppress without asserting his speedy trial right. *See, e.g.*, *Barker*, 407 U.S. at 535 (observing that, when defense counsel responded to State's motion for continuance by moving to dismiss indictment, without moving in alternative for immediate trial, "the record strongly suggests that while [the defendant] hoped to take advantage of the delay in which he had acquiesced, and thereby obtain a dismissal of the charges, he definitely did not want to be tried").

His motion to dismiss filed during voir dire indicated Appellant's desire to have no trial instead of a speedy one. *See Balderas*, 517 S.W.3d at 771. And his actions throughout the proceedings were inconsistent with a demand for speedy trial. This factor weighs heavily against finding a speedy trial violation.

### III.B.4. Analysis: Prejudice Caused by the Delay

Prejudice depends on the three interests a speedy trial is designed to protect:

---

[10] The State maintained that this information about Winfrey's contradicting statements was provided to Appellant's retained counsel in the original discovery tendered in 2013. The State provided the report documenting the conflicting account a second time, as it did with multiple discovery items, after appointed counsel communicated their belief that the discovery retained counsel had turned over to them was incomplete.

(1) preventing oppressive pretrial incarceration; (2) minimizing the defendant's anxiety and concern; and (3) limiting impairment of the defense. *Barker*, 407 U.S. at 532. The most serious of these is the last because the defendant's inability to prepare a defense skews the fairness of the entire system. *Id.*

Regarding prejudice, Appellant asserts:

The State's five (5) year delay placed Appellant in an untenable position. Ultimately, Appellant was prejudiced because he did not have the time necessary to adequately prepare and address all the issues presented during trial.

Appellant was prejudiced by his oppressive five[-]year pre-trial incarceration, which did nothing to minimize his anxiety or concerns. Appellant's defense was significantly impaired.

These conclusory statements do not constitute a showing of prejudice.

Appellant did not assert in his written motion to dismiss or his arguments to the trial court that he suffered oppressive pretrial incarceration. He simply mentioned in his motion that he had remained in custody continuously since his indictment. He did not show that he suffered anxiety or concern beyond the level normally associated with being charged with a capital crime. *See, e.g.*, *Cantu*, 253 S.W.3d at 286 ("[E]vidence of generalized anxiety, though relevant, is not sufficient proof of prejudice under the *Barker* test, especially when it is no greater anxiety or concern beyond the level normally associated with a criminal charge or investigation.").

Appellant claims that the delay prejudiced him because he lacked the time to adequately prepare for trial, but he fails to explain—and the record does not show—how the delay impaired his defense. On the contrary, Appellant benefitted from the delay because it yielded DNA test results that were favorable to him.

In short, the trial court could have reasonably concluded that Appellant failed to demonstrate sufficient prejudice from the delay. Therefore, this factor weighs against finding a speedy trial violation.

### III.B.5. Analysis: Balancing the Factors

Excessive delay supports Appellant's claim, but the other factors do not. The reasons for delay were valid or neutral or attributable to Appellant, he asserted his right tardily, and he showed no prejudice from the delay. The trial court did not err in denying Appellant's motion to dismiss based on a speedy trial violation.

We overrule point of error 1.

## IV. DENIALS OF CONTINUANCE

In points of error 33 through 54 Appellant complains about denials of motions and purported motions for continuance. These points were unpreserved, are inadequately briefed, or lack merit.

### IV.A. Unpreserved Points

Points 36, 40–43, 46, 47, and 54 are unpreserved because they are based on

oral requests for continuances. *See* Arts. 29.03 (allowing criminal action to be continued "on the written motion of the State or of the defendant"), 29.08 (providing that all motions for continuance "must be sworn to by a person having personal knowledge of the facts relied on for the continuance"). Such requests preserve nothing for review. *Anderson v. State*, 301 S.W.3d 276, 279 (Tex. Crim. App. 2009) (observing that sworn written motion is required to preserve appellate review of trial court's denial of motion for continuance). Points 33 and 38 lack even that foundation—they were announcements of "not ready for trial," but they were not requests for delay of trial, much less written and sworn requests for delay.

We overrule these points.

**IV.B.  Pretrial Motions for Continuance: Inadequately Briefed Points**

Points of error 34, 35, 37, 39, and 52 complain about denials of pretrial motions for continuance. They are inadequately briefed.

An appealing party's brief "must contain a clear and concise argument for the contentions made." TEX. R. APP. P. 38.1(i). A brief that fails to apply the law to the facts presents nothing for review. *See Swearingen v. State*, 101 S.W.3d 89, 100 (Tex. Crim. App. 2003).

Appellant's brief on these points describes events in the trial court but does not apply the law to the facts. Instead, he argues the points collectively and offers

generic examples of prejudice from the denial of his motions. His examples include "unfair surprise, inability to effectively cross-examine the State's witnesses, and the inability to adduce crucial testimony from a potential witness." But he identifies no surprise he was subjected to or cross examination or testimony that he was deprived of for lack of a continuance. He asserts that he "established 'sufficient cause' for granting continuances prior to trial" but he does not support the assertion. *See Renteria v. State*, 206 S.W.3d 689, 699 (Tex. Crim. App. 2006) (explaining that defendant "must show 'specific prejudice to his defense' to establish that the trial court abused its discretion in refusing to grant a continuance" (quoting *Heiselbetz v. State*, 906 S.W.2d 500, 512 (Tex. Crim. App. 1995))).

We overrule points 34, 35, 37, 39, and 52.

## IV.C. In-Trial Motions for Continuance: No Merit

In points 44, 45, 48-51, and 53, Appellant argues that he should have been granted a continuance after Cunningham testified against him in the punishment phase of trial. These points are without merit because the trial court did not abuse its discretion in denying the repeated motions.

## IV.C.1. Standard of Review

A trial court may grant a continuance "after the trial has begun, when it is

made to appear to the satisfaction of the court that by some unexpected occurrence since the trial began, which no reasonable diligence could have anticipated, the applicant is so taken by surprise that a fair trial cannot be had." Tex. Code Crim. P. art. 29.13. A trial court's denial of continuance is reviewed for an abuse of discretion. *Renteria v. State*, 206 S.W.3d 689, 699 (Tex. Crim. App. 2006). An abuse of discretion depends on specific prejudice to the defense because of the denial. *Id.* Speculation is insufficient. *Kinnett v. State*, 623 S.W.3d 876, 906 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd).

**IV.C.2. Analysis**

Appellant does not explain why Cunningham's appearance was an "unexpected occurrence . . . which no reasonable diligence could have anticipated" that caused Appellant to be "so taken by surprise" that he could not receive a fair trial. *See* Art. 29.13. On the contrary, Cunningham's appearance likely was not a surprise because before trial the State supplied the defense with copies of Cunningham's letters to the WCSO documenting his interactions with Appellant during their mutual incarceration. *See infra* Section VI.B.

Appellant points out that:

- one of his trial attorneys had previously represented Cunningham and asked the prosecution via email whether Cunningham would be called as a witness;

- the State did not answer the question;

- and Cunningham's name did not appear on its witness list.

Appellant argues that "these" were constitutional violations and that he "suffered 'actual prejudice[,]'" but his conclusory claims demonstrate no harm from the lack of continuance.

We overrule these points of error.

## V.  JURY SELECTION

Appellant raises twenty-eight points of error—numbers 5 through 32— asserting error in jury selection.

### V.A.  Digital Copies of Juror Questionnaires

In point of error 5, Appellant contends that the trial court erred when it denied his request to make digital copies of the juror questionnaires.  This point is without merit.

Before jury selection, the RPDO filed a motion seeking permission to digitally copy and share the questionnaires with RPDO's "professional staff" across the state.  The trial court denied the request but instructed the district clerk to print one hard copy of each completed juror questionnaire for each party and allowed the parties to make additional hard copies that were to be returned to the clerk after the completion of jury selection.

Appellant argues that the trial court's refusal to allow RPDO to electronically disseminate the confidential juror information to RPDO's personnel throughout the state violated his "constitutional protections" of effective assistance of counsel and due process of law. He suggests that his constitutional rights to effective assistance of counsel and due process include the right to digitize and disseminate confidential juror information, but he provides no authority to support the existence of such a right, nor are we aware of any. Moreover, he does not show that his counsel were denied access to the juror information, unable to analyze the juror questionnaires, or unable to prepare for voir dire. He does not explain how the denial of electronic copies denied him due process or effective assistance of counsel.

We overrule point of error 5.

## V.B.  Denial of Challenges for Cause

In points of error 6 through 19 Appellant argues that the trial court erred in denying his challenges for cause to certain venire members. These points are without merit, unpreserved, harmless, or inadequately briefed.

## V.B.1.  Standard of Review, Preservation, and Harm

A potential juror is challengeable for cause by the defense if he has a bias or prejudice in favor of or against the defendant or the law on which the defendant is

entitled to rely. Art. 35.16(a)(9), (c)(2); *see Gardner*, 306 S.W.3d at 295. "The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and follow instructions in accordance with the law." *Tracy*, 597 S.W.3d at 512. The law must be explained to the venire member, and he must be asked whether he can follow that law regardless of his personal views. *Id.* The challenger has to show that the challenge is proper, and he does not meet this burden until he has shown that the venire member understood the requirements of the law and yet could not follow it. *Id.*; *Gardner*, 306 S.W.3d at 295.

Error preservation and harm use the same test. The challenger must (1) assert a clear and specific challenge for cause; (2) use a peremptory challenge on the complained-of-venire member; (3) exhaust his peremptory challenges; (4) request and be denied additional peremptory challenges; and (5) identify an objectionable juror who sat on the jury. *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010) (stating test for preserving claim); *Comeaux v. State*, 445 S.W.3d 745, 750 (Tex. Crim. App. 2014) (stating test for harm).

When reviewing a trial court's decision to deny a challenge, we look to the entire record to determine support for the ruling. *Hudson v. State*, 620 S.W.3d 726, 731 (Tex. Crim. App. 2021). We reverse the ruling only for a clear abuse of discretion. *Id.* Because the trial judge is in the best position to evaluate a potential

juror's demeanor and responses, we review the trial court's ruling with considerable deference, especially when a venire member's answers are ambiguous, vacillating, unclear, or contradictory. *Tracy*, 597 S.W.3d at 512; *Gardner*, 306 S.W.3d at 296.

### V.B.2.  Point of Error 6

In point of error 6 Appellant contends that the trial court erred in denying his challenge for cause to venire member Miller.  He claims that Miller would have considered his failure to testify and placed the burden on him to prove he was not guilty. His claims are without merit.

When defense counsel questioned Miller about a possible defense failure to put on *any* evidence ("if we sit here like a couple of potted plants and we fail to put on anything"), Miller indicated that such failure might "possibly" factor into her decision. But she did not state that she would consider Appellant's failure to testify.  In fact, she later communicated the opposite:

> Q.  Let me ask you about something else in our law and that is, that a defendant never has to testify in a criminal case.  Do you understand that?
>
> A.  Yes.
>
> Q.  Okay.  If -- if the defendant in the case you're sitting in, if [Appellant] were not to testify in the case, okay, would you use that as a circumstance in determining whether he was guilty or not?

A. No.

Q. Okay. What about in the punishment phase? Could you still make your decision based on the -- whether or not the State had proved its case beyond a reasonable doubt?

A. More yes than no.

Q. I'm not sure I understand when you're saying "more yes than no."

A. In the punishment phase?

Q. Yes.

A. Not -- not hearing the testimony -- I mean, or – or hearing?

Q. Not hearing from the defendant?

A. Not hearing from the defendant. I think yes, I could.

Q. Yes, you could what?

A. Not make that play into my decision.

Miller's responses indicated that she would not hold Appellant's failure to testify against him.

 As for Appellant's burden-shifting argument, Miller said on her questionnaire that prosecutors "have a difficult job" and that defense attorneys "have an even harder job, proving someone not guilty." Defense counsel noted Miller's response and asked her, "Do you expect us to prove [Appellant] is not

guilty?" Miller answered, "I think that it can be done. I don't have much experience to know if it should be done or not, exactly how that -- that works."

When counsel followed up, Miller clarified that she could follow the law regarding the burden of proof:

> Q.     I anticipate that at the end of the -- of the -- that -- that part of the trial that the judge will instruct you that the State has the burden of proof on every element of the case.
>
> A.     Uh-huh.
>
> Q.     Okay. And if the State fails to meets [sic] its burden of proof beyond a reasonable doubt, then the law requires you to find [Appellant] not guilty.
>
> A.     Correct.
>
> Q.     Okay. Can you do that?
>
> A.     Yes.
>
> Q.     Can you follow that law?
>
> A.     Yes.
>
> Q.     Even on a capital murder case?
>
> A.     Yes.

Miller's answers showed that she would not shift the burden of proof to the defense.

We overrule point of error 6.

### V.B.3.  Points of Error 7, 10, and 11

In these points, Appellant complains about the denial of his challenges for cause to venire members McLaughlin, Henderson, and Pagoda, but he did not preserve error or show harm because he did not strike them peremptorily.  *See Davis*, 329 S.W.3d at 807 (preservation); *Comeaux*, 445 S.W3d. at 750 (harm).

We overrule points of error 7, 10, and 11.

### V.B.4.  Points 8 and 9, and 12 through 19

In these points, Appellant complains of the denials of his challenges for cause to venire members Hebert, Littleton, Hausler, Cox, Bius, Oates, Woods, Butler, Pinney, and Lynaugh, but his complaints are inadequately briefed.  *See* TEX. R. APP. P. 38.1(i).

Appellant paraphrases or quotes the venire member's responses given during individual voir dire or in the juror questionnaire.  He offers a combined argument that fails to associate a challenge with a given venire member.  Although he sets forth the law governing challenges for cause and appellate review of a trial court's denials of challenges, he fails to apply the law to the facts.  *See Swearingen*, 101 S.W.3d at 100.  His global assertions do not show how the trial court erred in denying any challenge for cause.  This Court will not construct Appellant's arguments for him.  *See Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011)

(explaining that inadequately briefed point of error presents nothing for review "as this Court is under no obligation to make appellant's arguments for her").

We overrule points of error 8 and 9 and 12 through 19.

**V.C.  *Batson* and *J.E.B.* Challenges**

In points of error 20 through 28 Appellant alleges that the State exercised its peremptory challenges in a discriminatory manner.  Specifically, in points of error 20, 24, 26, and 27, he argues that the State improperly struck venire members Baker, Cano, Morrison, and Jenkins based on race.  *See Batson v. Kentucky*, 476 U.S. 79 (1986) (prohibiting race-based peremptory challenges).  In points of error 21, 22, 23, 25, and 28, he contends that the State improperly struck venire members Loft, Reed, Brantley, Robinson, and Sonnier based on gender.  *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) (prohibiting gender-based peremptory challenges).

Appellant has inadequately briefed these points of error.  *See* Tex. R. App. P. 38.1(i).  While Appellant presents some facts and sets forth the applicable law in one combined argument, he fails to apply the law to the facts.[11]  *See Swearingen*, 101

---

[11]  For each venire member, Appellant notes the State's use of a peremptory challenge on the venire member, recites his trial objection and its basis (race or gender), recounts the State's proffered reasons for striking the venire member, and paraphrases or quotes some of the venire member's responses given during individual voir dire or in the juror questionnaire.  In his

(continued ...)

S.W.3d at 100. His general, conclusory assertions do not show why the trial court erred in its rulings. This Court will not construct Appellant's arguments for him. *See Lucio*, 351 S.W.3d at 896.

We overrule points of error 20 through 28.

## V.D.   State's Challenges for Cause

In points of error 29 and 30, Appellant argues that the trial court erred in granting the State's challenges for cause against venire members Reece and Williams.

Appellant has inadequately briefed these two points of error. *See* TEX. R. APP. P. 38.1(i). He presents minimal facts and sets forth some applicable law, but he fails to apply the law to the facts. *See Swearingen*, 101 S.W.3d at 100. His general, conclusory statements do not explain why the trial court erred in granting the State's challenge for cause to either of these venire members.

We overrule points of error 29 and 30.

## V.E.   Cumulative Error in Jury Selection

In points of error 31 and 32, Appellant asserts that "one or all or any combination of the [trial court's] errors" in jury selection deprived him of a fair

---

combined argument section, he cites the law governing the constitutional restraints on exercising peremptory challenges and the process for challenging an alleged discriminatory exercise of a peremptory challenge.

and impartial jury. In point of error 31, he asserts that this deprivation violated state law. *See* TEX. CONST. art. I, §§ 10 (right to impartial jury), 19 (right to due course of law); Arts. 35.16 (reasons for challenge for cause), 35.261 (prohibiting peremptory challenges based on race). In point of error 32, he asserts that his federal constitutional rights were violated. *See* U.S. CONST. amends. VI (right to impartial jury), XIV, § 1 (right to due process of law).

Appellant has inadequately briefed these points of error. *See* TEX. R. APP. P. 38.1(i). He summarily asserts that the jury selection errors discussed above deprived him of a fair and impartial jury. His conclusory assertions do not explain how the trial court's alleged errors in jury selection violated the Texas or United States Constitutions or the cited state statutes or how they deprived him of a fair and impartial jury. *See Swearingen*, 101 S.W.3d at 100.

We overrule points of error 31 and 32.

## VI. POINTS OF ERROR RE: CUNNINGHAM'S TESTIMONY

In points of error 56 through 59, 76, 121, and 126, Appellant asserts various trial court errors based on the punishment-phase appearance and testimony of Cunningham. These complaints are predicated on Appellant's claim that Cunningham was a State agent whose testimony violated Appellant's Sixth Amendment right to counsel. *See Massiah v. United States*, 377 U.S. 201 (1964).

They are without merit or inadequately briefed.

## VI.A. *Massiah*

*Massiah* held that the Sixth Amendment prohibits the use of a defendant's "own incriminating words" against him in a criminal proceeding if the government or one of its agents "deliberately elicited" the incriminating statement in the absence of defendant's counsel. *Id.* at 206. *Massiah* applies "only if the person who elicited statements from the defendant was a government agent." *Rubalcado v. State*, 424 S.W.3d 560, 575 (Tex. Crim. App. 2014). "[T]o qualify as a government agent, the informant must at least have some sort of agreement with, or act under instructions from, a government official." *Manns v. State*, 122 S.W.3d 171, 183–84 (Tex. Crim. App. 2003). In the absence of any such agreement or instruction, "no agency relationship exists for *Massiah* purposes." *Hall v. State*, 663 S.W.3d 15, 29 (Tex. Crim. App. 2021). In reviewing the trial court's ruling on this issue, we afford its fact findings and credibility determinations "almost total deference." *Id.*

Appellant contends that Detective Williams established an agency relationship between the State and Cunningham by testifying that Cunningham had been instructed to see if he could get Appellant to talk. The trial court implicitly found otherwise, and we defer to its judgment given the conflicting evidence it heard.

**VI.B. Background**

Cunningham, a former police officer, was jailed in Walker County Jail on drug charges. He was housed for a time with Appellant while Appellant was awaiting trial. Cunningham documented his interactions with Appellant and provided this information to the State. In July 2018, the State delivered Cunningham's notes to defense counsel in discovery via a USB flash drive in a file titled "Cellmate Letters." Two weeks later defense attorney Blazek emailed prosecutor Stephanie Stroud to say that he had previously represented Cunningham in a criminal matter before joining RPDO. Blazek stated that he had stopped reviewing discovery "until the potential problem is resolved." He asked the prosecutors to "assure [the defense team] that [Cunningham] is not a witness in this case." The State did not respond to Blazek's inquiry and did not include Cunningham on its witness list.

When Cunningham appeared to testify in the punishment phase, Blazek approached the bench to inform the court of his prior representation of Cunningham. Co-counsel Brian Lacour was then called to the bench. Thereafter, Lacour handled all matters related to Cunningham, raising objections during the State's direct examination and then cross-examining Cunningham.

Cunningham testified about his interactions with Appellant in the jail, including a conversation in which Appellant "never ever said [he] didn't do it, he just kept saying that, 'They're too stupid to catch me. I'm not -- I'm going to get away with it. There's no way they are going to catch me.'" Cunningham expressed that "[i]t seemed like [Appellant] had a lot of anger built up just at women in general." Cunningham related that Appellant told him that "he was seeing this woman, Tiffany, on the side and that she got pregnant in order to trap him so that he would have to pay her money."

Cunningham also described an incident in which he overheard Appellant say that he was going to kill somebody after razor blades had been found in their cell. Cunningham took that as a threat against him and "got really concerned about it." Several of Appellant's behaviors frightened him, including "a rage that was over and above anything that [he] would normally expect from somebody." Cunningham said that he became "progressively more and more worried about [his] actual safety." He also testified that Appellant exhibited deception in their interactions.

Cunningham denied that anyone had told him to talk to Appellant or to interview him. He said that he interacted with Appellant and documented their conversations and interactions "of his own free will."

On cross-examination, Cunningham testified that he did not know who Appellant was or what charges he faced before he was housed with him. Cunningham stated that he started taking notes because he began to think Appellant "was guilty and scary." He denied taking notes "to sell the information for leniency" and rejected the notion that he received leniency on his drug charge; he had expected to get probation all along.

The day after Cunningham testified, Appellant filed three motions relating to his appearance:

- a motion seeking to allow Blazek to withdraw as counsel;

- a document titled "Motions [sic] for Relief from Egregious and Inexcusable Prosecutorial Misconduct that has Created an Irreconciable [sic] Conflict of Interest Between the Regional Public Defender's Office and the State's Surprise Witness, Cunningham, Violated Due Process, the Right to the Effective Assistance of Counsel, the Right to Conflict Free Counsel, the Right to a Fair and Impartial Jury and the Right to a Fair Sentencing"; and

- the first of his six trial motions seeking a continuance that asserted that he was "so taken by surprise by the appearance of Mr. Cunningham that he cannot receive a fair trial" and sought a continuance of trial "for a time sufficient to allow [Appellant] to investigate State's witness Cunningham."

The trial court denied these motions. Later that day, however, Detective Williams re-animated the motions when he suggested that Cunningham had been instructed to "get [Appellant] to talk."

Williams testified on direct examination that, after Appellant's arrest, he was still part of the investigative team. Among other things, he listened to and decoded Appellant's phone calls and monitored his mail. But on cross examination, Williams testified that Cunningham had been brought to his attention by a jail supervisor. Williams thought "there was somebody that had met with [Cunningham.]" He thought "people above" him had placed Cunningham in Appellant's cell and arranged meetings between Cunningham and the DA's office. Williams never met Cunningham but received letters from him informing about Appellant. He testified, "Everything that I got from Mr. Cunningham was by correspondence." He forwarded the correspondence to the DA and put it in the case file. He denied that any promises had been made to Cunningham.

In a hearing the next day, Tim Whitecotton, a captain with the WCSO, testified that Cunningham had come to the attention of the sheriff's office after Cunningham sent his notes to Williams. Whitecotton testified that "there [was] no intention of anyone in the sheriff's office placing anyone in the cell with [Appellant]." He also testified that he instructed his investigators to "leave [Cunningham] alone" and do nothing except receive his letters. He contacted the prosecutor about Cunningham, and she echoed his hands-off approach.

After the hearing, the trial court denied the defense motion for continuance, but the defense moved for continuance again the next day. In that hearing, the State provided to the defense a copy of Cunningham's "jail packet" and told the trial court that, upon his arrest, Cunningham had been placed in an intake cell away from general population due to his status as a former police officer. That is, he had been placed with Appellant who shared a similar status as a former correctional officer. The prosecutor told the court that Cunningham was "moved several times in the jail, none of which had anything to do with this case"; his jail placement "was a decision that was made by the jail." The jail packet is not in the record, but Appellant did not contradict the prosecutor's statements or suggest that the jail packet showed anything other than a routine placement decision by the jail.

## VI.C. Denial of Motion to Strike Cunningham's Testimony

In point of error 59, Appellant contends that the trial court should have struck Cunningham's testimony based on *Massiah*. But the evidence about Cunningham's relationship with the State conflicted. Cunningham and Whitecotton denied any agency relationship, and Williams was inconsistent and vague about it. The trial court could have reasonably found that there was no agency relationship.

We overrule point of error 59.

**VI.D. Inadequately Briefed Points**

Appellant's remaining points of error based on Cunningham's appearance

and testimony are inadequately briefed.[12]  He recounts trial events but presents no

argument about how the trial court erred in denying these motions.  He presents

some law concerning the conflict of interest in legal representation but fails to apply

it to the facts of this case.  *See Swearingen*, 101 S.W.3d at 100.  He makes

conclusory statements and attempts to incorporate argument from other points of

error that were themselves inadequately briefed, but he does not explain how the

---

[12] In point of error 56, Appellant complains that the trial court denied his motion for "relief" from prosecutorial misconduct, arguing that the State "created an actual conflict-of-interest in this case" and that he "was entitled to conflict-free counsel to insure [sic] that he could receive effective assistance of counsel under the Sixth Amendment."

Point of error 57 complains that the trial court (1) refused to disqualify and sanction the Walker County District Attorney's Office and (2) denied a mistrial.  Appellant says the trial court erred in these rulings because the DA's Office misled "the defense about their intention to call Gregory Cunningham as a witness[.]"

Point of error 58 complains about the admission of Cunningham's testimony "in violation of" *Massiah*.

Point of error 76 complains about the admission of Cunningham's testimony for lack of notice.

Point of error 121 contends that the trial court erred in denying Blazek's motion to withdraw as counsel based on a conflict of interest due to Blazek's prior representation of Cunningham.

Point of error 126 asserts error in the trial court's refusal to order the State to disclose the names of all its witnesses.

trial court erred in its rulings.

We overrule points of error 56 through 58, 76, 121, and 126.

## VII.  EXPERT TESTIMONY

Appellant raises four points of error challenging the admission of expert testimony: points 113, 122, 127, and 128.  The first three are without merit, and point 128 is inadequately briefed.

## VII.A.  DNA Likelihood Ratio

In point of error 113, Appellant argues that the trial court erred during the guilt phase by admitting expert testimony about the likelihood ratio (LR) for the comparison of Appellant's DNA profile to the DNA mixture on the doorknob portion of the rope.

In her trial testimony, DNA analyst Claire Moyer explained that in a DNA profile comparison, the LR calculation governs the classification of a profile as excluded, included, or inconclusive.  She testified that the DPS lab assigns numeric values to each category range.  If the LR falls below 0.01, the profile is excluded.  If the LR falls above 1,000, the profile is included.  If the LR falls between 0.01 and 1,000, the profile is inconclusive.

When the prosecutor asked Moyer about "cross[ing] the line from excluded to inconclusive," Appellant objected.  He expressed his fear that the State was

going to use the number that categorized Appellant as excluded to suggest that he was "barely excluded, he's close to the edge of inconclusive." Appellant argued that that was "impermissible" because "[t]hat's not valid science" and would be misleading to the jury. The trial court overruled the objection but granted a hearing outside the jury's presence to determine the factual basis of expert testimony relating to the LR.

During the hearing, Moyer explained that State's Exhibit 191, an exhibit that had already been admitted without objection for demonstrative purposes, showed that there is a continuum in which "you go from excluded to an inconclusive range and then up into an inclusive range." The values on the continuum are in the lab's standard operating procedures for making the different category conclusions. Moyer testified that she uses those values "when making the determination of how to report out a likelihood ratio." According to Moyer, per DPS policy, an analyst's report states the LR for an inclusion profile. When the LR for a profile falls within either the inconclusive or the excluded ranges, the LR is documented in the case file but is not included in the report. Moyer testified that some in the forensic science community believe that the LR should always be reported, regardless of the category. She said that the ranges for the categories are DPS-specific. She also explained that the reporting of LRs is not related to lab accreditation. And, while

DPS's practice is to not report the LR for an inconclusive categorization, she knew of no policy prohibiting an analyst from reporting it.

Appellant's DNA expert Dr. Robert Benjamin also testified at the hearing. He confirmed the three categories for interpretation of a DNA profile comparison. He explained that an analyst calculates the LR, and that number determines which category the comparison falls into, based on the lab's criteria. He agreed that there is a "general requirement" that you report the statistical probability if the LR is in the included category. When asked about the significance of an LR that falls near the upper or lower part of the excluded range, Benjamin stated that he had never heard anyone testify that somebody was "heavily excluded" or "barely excluded." He explained that "[e]xcluded has traditionally been considered an absolute and you don't need a number. You calculate the number, which causes it to be given that classification, but [he had] never heard anybody report [the number for an exclusion]" in either a written report or to a jury. Benjamin stated that, because an analyst must calculate the number to assign a category, "[calculating the LR] is standard protocol in virtually every laboratory in the United States."

After the hearing, Appellant again objected to the State providing the exact LR for the comparison of Appellant's DNA profile to the DNA mixture on the rope. He asserted that the State was offering it "to show that there is another

category that is not just excluded but it -- in the excluded category, but it's barely, but it's almost in the inconclusive category." He argued that giving the LR violated Rule 702 because it did not assist the jury, was "not valid science," was not reliable, was misleading, and violated the *Daubert* and *Kelly* standards. Appellant further argued that evidence showing the exact LR violated the Fifth and Fourteenth Amendments by denying him due process of law. Finally, Appellant asserted that allowing testimony about the exact LR was "improper" because DPS protocols allow the analyst to report a person's profile as included, excluded, or inconclusive, but no DPS protocol allowed an analyst to report the LR for an excluded profile.

The trial court found that Moyer was "qualified to make the mathematical calculations, and that the use of those calculations to interpret the results of the DNA testing is accepted in the scientific community." The court further found "that the conclusions reached by this particular witness may be of assistance to the jury." The court overruled Appellant's objections and granted a running objection to Moyer's testimony about the LR.

Moyer then testified before the jury about the results of her DNA testing. She explained the three categories for interpretations of DNA comparison and gave the numerical range for each category. In testifying about her results, she provided

the LR for A.L.'s inclusion in the DNA mixture on the ligature rope. She did not provide the LR for any other profile in her comparisons to the mixture from the ligature rope. When testifying about the doorknob section of the rope, Moyer provided the LR for A.L., confirming that he could not be excluded as a contributor to the DNA mixture. She did not provide the LR for any other profile in her comparisons to the mixture from the doorknob section of the rope.

DNA analyst Jennifer Pollock testified that she conducted Minifiler testing on the doorknob section of the rope. She concluded that the DNA sample from the rope contained a mixture of three individuals. She generated LRs for her comparisons. These LRs indicated that A.L.'s profile fell in the included range. The LRs for Robert Crawford and Catrina Butler fell in the excluded category. Appellant, Tiffany Crawford, Shanta Crawford, Veronica Sanders, Pam Burrell, and Celestina Rossi fell in the inconclusive category.[13] The prosecutor asked Pollock what the LR for Appellant was. Appellant objected, making the "same objection" that he had made to "the other witness."[14] The trial court overruled

---

[13] Pollock did not testify about A.L.'s inclusion LR, but the number was included in her report, which was admitted into evidence without objection. The LRs for the excluded and inconclusive individuals were not included in her report. She did not she testify about them until asked.

[14] Presumably the "other witness" was Moyer. However, we note that Appellant's objection here was not entirely "the same." The basis for Appellant's objection during Moyer's

(continued ...)

the objection.  Pollock testified that Appellant's LR was 995.[15]

If an expert's testimony involves a "hard science" (a science that involves precise calculations and the scientific method), we determine the reliability of the testifying expert's opinions by deciding whether (1) the underlying scientific theory is valid, (2) the methodology applying the underlying scientific theory is valid, and (3) the expert properly applied the correct methodology on the occasion in question.  *Null v. State*, 690 S.W.3d 305, 311 (Tex. Crim. App. 2024); *see Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). We have identified a list of nonexclusive factors that can be used to assess reliability.  *See Kelly*, 824 S.W.2d at 573.  They include: (1) acceptance by the relevant scientific community, (2) qualifications of the expert, (3) literature concerning the technique, (4) the potential rate of error of the technique, (5) the availability of other experts to test and evaluate the technique, (6) the clarity with which the underlying theory or technique can be explained to the court, and (7) the experience and skill of the person applying the technique.  *Kelly*, 824 S.W.2d at 573.

---

testimony was to the LR underlying an "exclusion" categorization because the State was, in Appellant's view, trying to use the LR supporting the "exclusion" designation to show that Appellant was "barely excluded" and close to being in the "inconclusive" category.  The question to Pollock, however, was about the LR underlying Appellant's "inconclusive" categorization.

[15]  On cross-examination, Appellant asked for the LR for each of the six other individuals whose profile fell in the inconclusive range.

Expert testimony admissible under Rule 702 might still be inadmissible under Rule 403. *Null*, 690 S.W.3d at 311; *see* TEX. R. EVID. 403 (otherwise admissible evidence can be nonetheless inadmissible if its "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence").

Appellant contends that the trial court abused its discretion in "allowing the State to offer unreliable expert testimony outside DPS protocols which under Rule 702 was unreliable and misleading to the jury and the probative value was substantially outweighed by its prejudicial effect." [16] He argues that the trial court erred in allowing testimony about Appellant's LR of 995 "because the reliability of this evidence was not established by clear and convincing evidence." But all the DNA experts—including Appellant's expert—testified that the LR is calculated by the analyst to determine into which category the profile falls. As his expert explained, calculating the LR is "standard protocol in virtually every laboratory in the United States." Thus, the evidence demonstrated that the 995 LR placing

---

[16] Appellant's Rule 403 objection at trial asserted that the LR testimony was misleading for the jury. He did not assert to the trial court that the probative value of the LR evidence was substantially outweighed by a danger of unfair prejudice. To the extent that Appellant attempts to raise that complaint now, he did not preserve it for appellate review. *See* TEX. R. APP. P. 33.1(a)(1)(A); *Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004) ("[T]he legal basis of a complaint raised on appeal cannot vary from that raised at trial.").

Appellant in the inconclusive category was scientifically reliable evidence.

Appellant does not dispute the scientific reliability of the 995 LR or the placement of his profile in the inconclusive category based on that LR. Rather, he objects to the disclosure of the exact LR to the jury. The reporting of the exact LR or the disclosure of it to a jury, however, is not part of the scientific theory, methodology, or technique. Instead, it is a function of DPS lab protocols.Appellant states that the DPS lab protocols "specifically prohibited documenting the LR for anyone in the 'inconclusive' spectrum or range." Appellant mischaracterizes the evidence.

First, Moyer testified that, when making the comparisons, the LR is documented in the case file for every profile. The issue is whether the LR is included in the analyst's report. On that issue, Moyer disagreed that DPS policy prohibited reporting it. She stated:

> I don't know of any policy that says I can't report it. That's not what we would typically do. But I think if I really felt I needed to report that LR, I mean that would be a conversation I would have with my technical leader or my supervisor, but I don't know of our policy saying that you cannot report it because we calculate it. So therefore, it's in the case record. You have access to it. We -- it is the value. So I'm not sure if I would say it's our policy that you cannot report it. We just don't typically report it.

Moreover, Moyer testified that some in the forensic community believe that the LR should always be reported, regardless of the category into which the number places

a particular profile.

Appellant suggests that allowing the jury to know the placement within the category range—that is, where on the continuum the LR falls—misleads the jury.[17] But he fails to explain how the information was misleading. The experts testified that an LR placing a profile in the "inconclusive" category means that the analyst was unable to determine whether the profile was excluded or included. "Inconclusive" means no determination. While Appellant characterized the 995 LR as suggesting "barely inconclusive" or "almost included," no expert attached such meaning to the LR. And Appellant's expert explicitly rejected such a categorization.[18]

The trial court did not abuse its discretion in allowing the expert testimony about Appellant's LR.

---

[17] In the hearing, Appellant attempted to suggest to Moyer that the DPS reporting protocols (of not reporting "inconclusive" LRs) was to avoid misleading a jury. But Moyer explained,

> We have -- the validation that we internally did was to -- to avoid any potential false exclusions or inclusions. The weight of what that LR[] means whether it's inclusion -- even the inclusionary LR, that weight is not up to me to decide what weight that has. That is up to the jury to decide the weight of that number.

[18] We acknowledge that the State later implied such a meaning during its jury argument. However, that subsequent jury argument is a separate issue; it does not affect the admissibility question. We must review the trial court's evidentiary ruling considering what was before court when the ruling was made. *See Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

We overrule point of error 113.

## VII.B.   Future Dangerousness

In point of error 122, Appellant challenges the testimony of TDCJ Regional Director Melodye Nelson.  In point of error 127, he complains of the testimony of forensic psychologist Darrel Turner.

## VII.B.1.  Director Nelson

Appellant claims the trial court erred in admitting Nelson's testimony about his future dangerousness because she lacked any expertise to support that opinion.  But she offered no such opinion.  Instead, she testified that Appellant's experience as a correctional officer, his knowledge of TDCJ's security measures, and his attempt to smuggle contraband into the jail could be cause for concern.  Her opinion on that point was supported by her training and experience and so was admissible under Rule 702.

## VII.B.2.  Rule 702

Expertise under Rule 702 "can be acquired in numerous ways, including by training or experience."  *Davis v. State*, 313 S.W.3d 317, 350 (Tex. Crim. App. 2010); *see also Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019) (observing that expertise "may be derived from specialized education, practical experience, a study of technical works or a combination of these things" (quoting

*Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000))).  Further, while an expert must possess some additional knowledge or expertise beyond that of the average person, "the gap need not necessarily be monumental."  *Davis*, 313 S.W.3d at 350.  "If the witness has some special knowledge or additional insight into the field that would be helpful, then the expert can assist the trier of fact to understand the evidence or to determine a fact in issue."  *Id.* (quoting *Rodgers v. State*, 205 S.W.3d 525, 527–28 (Tex. Crim. App. 2006)).

### VII.B.3.  Nelson's Expertise

During a hearing outside the jury's presence, Nelson testified that she had two associate's degrees (one in "mid[-]management," one in correctional science) and a bachelor's degree in correctional administration and management.  She began her career as a correctional officer in 1989 and "worked [her] way through the ranks"; she worked as a correctional officer, a sergeant of correctional officers, a lieutenant, a captain, a major, an assistant warden, a senior warden over three facilities, and ultimately as the regional director for central Texas overseeing eighteen prison units.

Nelson's testimony demonstrated: (a) her knowledge of TDCJ and its day-to-day operations; (b) her familiarity with TDCJ's protocols governing correctional officers and its policies and practices regarding inmates; (c) her understanding of

and experience with violence within the prison system; and (d) her awareness of statistics related to inmate behavior, i.e., which types of incidents were most frequent.

The State provided Nelson with information about Appellant: his status as a former TDCJ correctional officer and his documented attempt to smuggle contraband into the jail while awaiting trial. Nelson opined that "someone who is a former correctional officer in our -- in our own agency would have direct knowledge of our policies, our procedures, our security techniques, things of that nature, and -- and if he's trying to get contraband into a county jail, that would be problematic [to] put into our facilities." Nelson's opinion that Appellant's experience as a prison guard and his attempt to smuggle contraband into the jail while awaiting trial could be a cause for concern was well supported by her education and work experience. Accordingly, the State proved by clear and convincing evidence that her testimony would be reliable and helpful to the jury in deciding Appellant's future dangerousness. *See Blasdell v. State*, 470 S.W.3d 59, 62 (Tex. Crim. App. 2015). The trial court did not abuse its discretion in permitting Nelson's expert testimony.

We overrule point of error 122.

**VII.B.4. Dr. Turner**

In point of error 127, Appellant complains about the testimony given by forensic psychologist Darrel Turner that Appellant's "characteristics are similar to those of a person with a high degree of antisociality." He argues that Turner's testimony did not properly rely on the accepted principles of psychology because (1) he used a psychopathy checklist in forming his opinion, and (2) he rendered the "functional equivalent" of a diagnosis without having conducted an in-person evaluation of Appellant. Appellant cites no authority in support of limiting opinion testimony offered by a forensic psychologist to diagnoses. He instead relies on "*Coble*" without further citation and without explaining its applicability to this case. In any event, the trial court did not abuse its discretion in admitting Turner's testimony.

The admission of soft-science testimony depends on whether (1) the field of expertise is legitimate, (2) the testimony falls within the scope of that field, and (3) the field's principles were properly used. *Coble v. State*, 330 S.W.3d 253, 274 (Tex. Crim. App. 2010).

At a hearing outside the jury's presence, Turner testified about his background, training, education, and professional experience with psychopathy. Turner stated that he had published research on psychopathy, and trained with the person who created the Psychopathy Checklist-Revised or Hare Psychopathy

Checklist ("PCL-R")), an instrument used to for measure psychopathy. Turner

also testified that he had professionally interacted with hundreds of psychopathic

individuals.

Turner reviewed documents associated with Appellant's case and offered an

opinion about Appellant's personality.[19] He explained that he could not ethically

diagnose Appellant without evaluating him in person, but he had formed an

opinion, based on the Hare Psychopathy Checklist, about Appellant's personality

characteristics and behavior traits identified from the records. Ultimately, Turner

opined that "there are characteristics present in [Appellant] that differentiate him

from a quote/unquote normal person that commits murder and that these

characteristics are similar to those of a person with a high degree of antisociality."

Appellant asserts that Turner's use of the psychopathy checklist "alone is a

sufficient basis for disqualifying the admission of his 'expert opinion.'" This

assertion appears to be based on Appellant's understanding that, in a 2017 article,

Dr. Robert Hare, who formulated the checklist, said that the checklist was not

---

[19] Turner testified that he reviewed the police investigative materials (including police reports, police narratives, supplemental offense reports, and interviews with witnesses); a description of the crime scene and the condition of the bodies; various statements that Appellant had made; information about Appellant's relationships with co-workers, family members, and women; statements made by Appellant's older children; CDCF records; and records from Appellant's interactions with police, including from his jail incarceration while awaiting trial.

recommended for criminal cases. But Turner's testimony on the issue suggested otherwise. After reviewing the article, Turner disagreed that the article proscribed the use of the PCL-R in criminal proceedings. Turner explained that the article criticized specific types of training for using the PCL-R and some specific uses of the PCL-R that have been shown to be less reliable. But the article was "[n]ot saying that the PCL-R should, as a whole, not be used in criminal proceedings. That's not what this article said." Turner stated that Appellant's counsel was "over simplifying [sic] the results of that article." Moreover, the trial judge asked Turner if the methodology that he used in forming his conclusions (which included the use of the PCL-R) was generally accepted in the field of study at issue, and Turner confirmed that it was.

Appellant also contends that Turner "touched upon every psychological factor which created the 'functional equivalent' of a diagnosis[,]" suggesting that Turner failed to properly rely upon the accepted principles of psychology because, as Turner explained in his testimony, he could not ethically render a diagnosis without meeting with and evaluating Appellant in person. However, as Turner explained, "in forensic psychology, [psychologists] are applying the knowledge of the field of psychology to the courtroom."

Turner described the psychological concepts of personality, personality

characteristics, personality disorders, and psychopathy generally. He noted common characteristics of a psychopath and discussed the psychopathy checklist. He then applied the information he gleaned from his review of Appellant's case to characteristics identified on the checklist, testifying about certain of Appellant's behaviors that correlated to characteristics on the checklist. Ultimately, Turner opined that Appellant possessed personality characteristics like those of a person with a high degree of antisociality. He also explained that "not everyone who has an antisocial characteristics [sic] is violent, but many are"; and "there's a correlation between violence and antisociality."

Appellant offers no authority in support of his argument that Rule 702 forecloses non-diagnostic, expert psychological testimony, and Turner's testimony showed that he properly used the field's principles. Accordingly, the trial court did not abuse its discretion in admitting the testimony.

We overrule point of error 127.

## VII.C.  Cross Examination of Defense Expert

In point of error 128, Appellant complains about the State's cross examination of sociologist Dr. Renelinda Bressler who testified about the impact of an impoverished childhood and other sociological factors on Appellant's conduct as an adult. Appellant objected when the State asked her if "extreme poverty

[makes] you kill people[.]" He contends that the State's question suggested that mitigation evidence was an "excuse."

Appellant has inadequately briefed this point of error because he fails to apply any applicable law to the facts. *See* TEX. R. APP. P. 38.1(i); *Swearingen*, 101 S.W.3d at 100. His speculative and conclusory statements are not a substantive legal analysis of how the challenged cross-examination violated the Eighth Amendment or how the trial court erred in overruling his objection to the question.

We overrule point of error 128.

## VIII.  NON-EXPERT TESTIMONY

Appellant presents twenty-seven points of error challenging rulings on non-expert testimony. They are inadequately briefed.

In points of error 60 through 64, 66, and 67, Appellant contends that the trial court erred by admitting hearsay evidence.[20]

---

[20]  Appellant challenges the testimony of: Robert Crawford about his wife's concerns about Appellant on the day of Appellant's unannounced visit to the Crawfords' home (point of error 60); Tiffany Crawford about her mother's description of Appellant's unannounced visit and how she felt about it (point of error 61); Detective Williams about Tiffany's report to him of items missing from the Crawfords' home after the murders and about the coded phone calls between Appellant and his ex-wife in which they made disparaging remarks about the prosecutor and discussed her physical characteristics (points of error 62 and 67); Deputy Tom Bean about the nature of Tiffany and Appellant's relationship and how Appellant manipulated different women (points of error 63 and 64); and Detective Steve Jeter about his investigation of an alleged phone call that Anquitel Butler made to police suggesting she had information about the case (point of error 66).

In point of error 65, he complains of the trial court's exclusion of hearsay evidence, which he alleges erroneously limited his cross-examination of Detective Billingsley.[21]

In points of error 77, 82, 107, and 124, Appellant challenges the admission of "inflammatory" evidence.[22]

In points of error 78 through 81, he asserts that the trial court erred by allowing various law enforcement officials to "offer evidence about Appellant's truthfulness."[23]

---

[21] The trial court sustained the State's hearsay objections when Appellant asked Billingsley if Tiffany had told him that she and her mother once went to a shelter when she was a child and if he had heard that Shanta's ex-husband Donald Jenkins once gave Shanta a black eye.

[22] Appellant argues that the trial court erred by admitting "totally irrelevant" and "inflammatory" redirect testimony by Detective Billingsley (point of error 77). On cross examination, Billingsley admitted that he had never examined divorce records documenting (a) a complaint by Shanta that Jenkins had threatened her and (b) their dispute over a car in 1999-2000. Billingsley admitted that the evidence was relevant and that he had failed to investigate Donald Jenkins in 2013. On redirect the State asked him if he had ever before seen a baby hung from a door because of a fight over a car.

Appellant also claims the trial court erred in: allowing Ranger Bess to testify based on the victims' injuries and the lack of forced entry that the murders "seemed very, very, very personal" and to "give an opinion where he did not have personal knowledge" about the investigation's thoroughness with respect to Jenkins (points of error 82 and 107); and permitting Detective Williams to testify about his opinion that Appellant was manipulative of his ex-wife Hart (point of error 124).

[23] Appellant complains of the testimony of: Ranger Trace McDonald about Appellant's hesitation before answering questions (point of error 78); Detective Williams concerning the "very elaborate story" Appellant manufactured about an inmate as a possible suspect (point of error 79); Deputy John Pugh regarding Appellant's truthfulness (or lack thereof) to his ex-wife

(continued ...)

In points of error 83 through 91, he argues that the trial court erred by admitting opinion testimony from various witnesses about Appellant's future dangerousness.[24]

In point of error 105, Appellant alleges that the trial court erred in "allowing victim impact testimony from law enforcement officers."[25]

In point of error 106, he argues that the trial court erred in allowing the

---

Rafaella Hart and the validity of Appellant's threats (point of error 80); and Ranger Bess about Appellant not giving an honest accounting of his activities on July 24th (point of error 81).

[24] Appellant challenges the testimony of: Lieutenant Brad Fullwood about believing, after listening to the coded calls between Appellant and Hart, that Appellant was dangerous (point of error 83); Detective Williams regarding his belief that Appellant's manipulation of Hart was an indicator that he was dangerous and that the ability to manipulate others makes someone dangerous in an incarcerated setting (points of error 84 and 85); Cunningham that he did not feel safe in a cell with Appellant and that he believed that Appellant was dangerous (points of error 86 and 87); Detective Pugh concerning his belief, based on Appellant's manipulative nature (specifically his manipulation of and deception toward Hart), that Appellant was a danger (point of error 88); Frank AuBuchon about "dangerousness issues in the TDC[J] system" (point of error 89); Appellant's son Darian that Appellant was dangerous (point of error 90); and Deputy Keith Dehart that Appellant was a danger based on his behavior in jail (threatening people, possessing a weapon, and attempting to circumvent jail security measures) (point of error 91).

[25] "'Victim impact' evidence is evidence of the effect of an offense on people *other* than the victim." *Roberts v. State*, 220 S.W.3d 521, 531 (Tex. Crim. App. 2007). Appellant cites no authority that law enforcement officers cannot fall into the category of other people. Although he purports to challenge the testimony of multiple law enforcement officers, he references only the testimony of Detective Williams in which Williams expressed how that "the nature of [the case]" had taken a toll on him. He cites *Payne v. Tennessee*, 501 U.S. 808, 825 (1991), but he does not explain how the purported victim impact testimony from law enforcement constitutes a due process violation under *Payne*. Nor does he explain how the admission of this testimony "violated his Eighth and Fourteenth Amendment rights."

medical examiner to testify about the autopsy performed on Shanta Crawford.[26]

Appellant has inadequately briefed these points of error because he fails to apply the law to the facts. *See* TEX. R. APP. P. 38.1(i); *Swearingen*, 101 S.W.3d at 100. His conclusory statements are not substantive analysis of the trial court's purported errors.

We overrule points of error 60 through 67, 77 through 91, 105 through 107, and 124.

## IX. POINTS OF ERROR CHALLENGING EXHIBITS

Appellant raises fifteen points of error challenging the admission of various exhibits during both phases of trial. All of these points are inadequately briefed, and the last is both inadequately briefed and multifarious.

### IX.A. Inadequately Briefed Points

In points of error 98 through 104, Appellant asserts that the trial court erred during the guilt phase of trial by admitting various photographs.[27]

---

[26] Appellant fails to specify any objectionable portion of the medical examiner's testimony; he identifies no purportedly "graphic detail[s]" that were improperly admitted.

[27] Appellant challenges the admission of: State's Exhibits 10 and 11, photographs "showing the bodies of [A.L.] and Shanta Crawford" (point of error 99); State's Exhibits 26 and 27, "two (2) exhibits of [Tiffany Crawford's] son [A.L.]" (point of error 100); State's Exhibits 36 through 45, "numerous autopsy photographs of [A.L.]" (point of error 101); State's Exhibits 47 through 60, "numerous autopsy photographs of Shanta Faye Crawford" (point of error 102); State's Exhibits 65 and 66, "photographs from the crime scene, including photographs of [A.L.]"

(continued ...)

In points of error 110 and 111, he urges error in the admission of items recovered from his vehicle at the time of his arrest.[28]

In point of error 112, he contends that the trial court erred in admitting "bloody clothing and other items" that were unfairly prejudicial.[29]

In point of error 114, he argues that the trial court erred in "allowing the State's witness to use State's Exhibit 195 to render an opinion to establish his conclusions about the time of death."[30]

---

(point of error 103); and State's Exhibits 168, 173, 175, 176, and 177, "medical examiner photographs" that "reflected the changed conditions of the body" (point of error 104).

In point of error 98, Appellant asserts that there was no fact issue as to the cause of death of the victims or as to their identity. He then states in an incomplete sentence: "Notwithstanding these uncontroverted facts, the State (over objection) introduced numerous photographs of these individuals before the jury, including:" Nothing follows the colon. The brief then proceeds to point of error 99. This point of error, perhaps intended to be an introduction to points of error 99 through 104, presents nothing for review.

[28] In point of error 110, Appellant challenges the denial of his "motion to suppress the warrantless search of his vehicle legally parked far away from the site of his arrest." In point of error 111, he challenges the admission of State's Exhibits 102 through 106, which he identifies as items recovered during the warrantless search: "a Reuger [sic] 9mm (SX #103) and ammunition (SX #102)[,] A cellphone (SX #104) and gloves (SX #105) . . . [and] Condoms (SX #106)[.]" Appellant mislabels two of these items. State's Exhibit 102 is "a Ruger 9 millimeter handgun with two magazines and some loose bullets" that were located on the floorboard "in a little black case." State's Exhibit 103 is the "black case."

[29] Appellant describes the challenged items as "Bloody clothes collected from the ME's Office (SX #117), a blood stained shirt (SX #119), stained underwear worn by Shanta Faye Crawford (SX #120), baby blankets (SX #131 and 132), a diaper (SX #133), and sandals (SX #141)." The record reflects, however, that State's Exhibit 133 is part of the doorknob to which the ligature used to hang A.L. was tied, not a diaper.

[30] Appellant fails to identify State's Exhibit 195 or explain how it was purportedly

(continued ...)

In points of error 108, 109, and 115, Appellant challenges the admission of his cell phone records that law enforcement had obtained pursuant to a search warrant.[31]

Appellant has inadequately briefed these points of error because he fails to apply the law to the facts. *See* TEX. R. APP. P. 38.1(i). *See Swearingen*, 101 S.W.3d at 100. His conclusory statements are not substantive legal analysis of the trial court's rulings admitting the challenged exhibits or denying his motion to suppress.

We overrule points of error 99 through 104, 108 through 112, 114, and 115.

## IX.B.  Inadequately Briefed and Multifarious Point

---

improperly used. We have determined that Exhibit 195 is a PowerPoint presentation prepared by Brett McDaniel, the State's cell phone expert, after he reviewed Appellant's cell phone records and analyzed the cell site location information. It was admitted as a demonstrative exhibit during McDaniel's testimony. The record reflects that Appellant objected to the exhibit by writing numbered objections on exhibit pages that represented slides in the presentation (for example, counsel wrote "Δ obj 1" on slide thirty-seven, "Δ obj 2" on slide thirty-eight, etc.). He made nine objections, arguing the legal basis for each written objection to the trial court. Appellant fails to present or describe the contents of the various slides to which he objected.

Moreover, McDaniel did not offer an opinion about the "time of death." Rather, he testified that 14 minutes was "more than enough time for a person to commit those two murders." McDaniel also testified he is a former homicide detective.

[31] Appellant complains of the denial of his motion to suppress "cell phone tower records because there was not probable cause to establish admissibility" (point of error 108); asserts error "in admitting cellphone records identifying phone numbers" (point of error 109); and challenges the admission of State's Exhibits 193 and 194, which he describes as T-Mobile records and Cellebrite extractions (point of error 115). He appears to challenge the sufficiency of the affidavit underlying the search warrant used to obtain his cell phone records, but he fails to discuss any portions of, or present the content of, that affidavit. He references two exhibits in the record, but neither exhibit is the search warrant affidavit.

In point of error 141, Appellant contends that the trial court erred "in denying [his] motion to suppress his 'custodial' statement made to Detective Billingsley without *Miranda* warnings."[32]  This point is inadequately briefed and multifarious.

Appellant has inadequately briefed this multifarious point of error.  *See* TEX. R. APP. P. 38.1(i); *see also Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010) ("Because appellant bases his single point of error on more than one legal theory, his entire point of error is multifarious."); *Mays v. State*, 318 S.W.3d 368, 385 (Tex. Crim. App. 2010) ("[T]his point of error is multifarious because it raises more than one specific complaint and risks rejection on that basis alone.").  He conflates voluntariness with custody, and he argues about the jury charge.  To the extent he argues that his statement was involuntary, he fails to present any substantive legal analysis applying the law to the facts.  *See Swearingen*, 101 S.W.3d at 100.

As for Appellant's "custodial interrogation" argument, he mischaracterizes the record.  He claims that he expressed a desire to terminate the interview "25

---

[32]  We find no written motion to suppress Appellant's statements to Detective Billingsley in the record.  Instead, when the State offered a recording and transcription of Billingsley's interview with Appellant, Appellant objected to the admission of specific portions of the interview, seeking to have them redacted.

times!"  But he did not.  Instead, he asked about the individuals who had accompanied him to the Walker County Sheriff's Office and repeatedly expressed that he wanted "to check on [them]" and wanted "to go see them."[33]  Appellant fails to support his argument that deflecting or refusing his requests rendered him in custody.  *See State v. Saenz*, 411 S.W.3d 488, 496 (Tex. Crim. App. 2013) ("A person is in custody only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest.").

Even assuming for the sake of argument that the purported denial of Appellant's requests amounted to custody, Appellant fails to explain how the trial court erred by admitting the statements Appellant made before then.

We overrule point of error 141.

## X.  EXTRANEOUS CONDUCT EVIDENCE

---

[33]  Referencing State's Exhibits 72 and 184A, Appellant states that during a "protracted interrogation," he "expressed his desire to terminate the interview and leave the interview room" twenty-five times, but the detectives "refused to honor [his] requests."  Appellant argues, "Once Billingsley refused to let Appellant leave – this created a 'custodial interrogation' under *Miranda v. Arizona* and Art. 38.22, Texas Code of Criminal Procedure."  We note that State's Exhibit 72 is not the recording of Billingsley's interview with Appellant but the audio recording of Appellant's conversation with Detective Williams when Appellant told the fabricated story identifying an inmate as a possible suspect.  *See* TEX. R. APP. P. 38.1(i).

Appellant raises sixteen points of error relating to the admission of extraneous conduct evidence during both phases of trial. They are inadequately briefed.

In point of error 118, Appellant contends that the trial court erred in denying his motion in limine regarding extraneous offenses.

In point of error 119, Appellant asserts that the trial court erred "in admitting text messages in violation of the Eighth Amendment."[34]

In points of error 55 and 123, he asserts error related to evidence that he targeted one of the prosecutors in his case.[35]

In point of error 120, Appellant argues that the trial court erred "in admitting evidence of extraneous bad conduct committed by a third party."[36]

---

[34] This point of error relates to the text messages between Appellant and Pam Burrell after A.L.'s death. It is unclear from Appellant's briefing what evidence he challenges here: the exhibit containing the text messages or Burrell's testimony about the texts or both. In any event, he does not quote the text messages or describe their content other than asserting that the text message exhibit was "offered to establish that Appellant was having an affair."

[35] In point of error 55, Appellant contends that the trial court erred when it denied his motion to disqualify the Walker County District Attorney's Office "due to a conflict of interest where Stephanie Stroud the lead prosecutor and First Assistant was shown to be an alleged victim of an extraneous offense involving Appellant and his ex-wife." In point of error 123, Appellant argues that the trial court erred in admitting Detective Williams's testimony "about alleged extraneous offenses including [Appellant] targeting the prosecutor in the case."

[36] This point relates to Sharon Lynch's testimony about an incident in which Appellant's ex-wife Hart followed Lynch and Appellant and rammed Lynch's car with hers.

In point of error 125, Appellant contends that the trial court erred by admitting Deputy Pugh's testimony about the search of Hart's Tennessee home.

In points of error 129 and 130, Appellant challenges the admission of evidence from the Connecticut Department of Children and Families (CDCF) relating to his son Darian.[37]

Appellant has inadequately briefed these points of error. *See* TEX. R. APP. P. 38.1(i). He recites his trial objections and describes his arguments to the trial court, but he does not apply the relevant law to the facts of his case. *See Swearingen*, 101 S.W.3d at 100. His conclusory statements do not substantively analyze the trial court's supposed error.

We overrule points of error 118, 119, 55, 123, 120, 129, and 130.

Points of error 68 through 75 complain about the admission of extraneous conduct evidence and the trial court's denial of a motion to strike such evidence for

---

[37] In point of error 129, Appellant argues that the trial court erred in admitting, under the business records exception, *see* TEX. R. EVID. 803(6), State's Punishment Exhibit 9, the CDCF records "over Appellant's Sixth Amendment objections." The record indicates that defense counsel reviewed State's Punishment Exhibit 9 page by page, asserting various objections. Appellant notes that he "lodged objections 49-137 setting forth the reasons why the records were inadmissible," but he does not identify the specific portions of the exhibit to which these objections were lodged or describe the legal basis for these objections. In point of error 130, Appellant asserts that the trial court erred in allowing CDCF social worker Mark Williams to testify as "a fact witness."

lack of notice.[38] Appellant has inadequately briefed these often-multifarious points of error. *See* TEX. R. APP. P. 38.1(i); *Davis*, 329 S.W.3d at 803.

Regarding his motion to strike (point of error 68), Appellant claims that the State's notice was insufficient, but he cites no law governing the State's obligation to provide notice of its intent to offer extraneous conduct evidence or what constitutes sufficient notice. Also, his conclusory statements do not substantively analyze how the State failed to give the requisite statutory notice or why the trial court erred in failing to strike the State's notice. *See Swearingen*, 101 S.W.3d at 100. We note that in denying Appellant's "blanket request…concerning the notice itself," the trial court indicated it would address "on an individual basis, the individual pieces of that notice" as the evidence was offered.

We overrule point of error 68.

---

[38] Appellant complains about the admission of: State's Exhibit 72, the audio recording of Appellant's conversation with Detective Williams in which Appellant falsely identified an inmate as a possible suspect (point of error 69); Ranger Bess's testimony about the statements that Appellant made to Detective Billingsley about the inmate as a potential suspect and Appellant's subsequent admission to Billingsley that he lied about the inmate (point of error 70); evidence of extraneous conduct contained in the recording of Billingsley's interview with Appellant or in Billingsley's testimony about it (point of error 71); "bad acts evidence of adulterous relationships" (point of error 72); evidence of Appellant's behavior toward a Walker County Jail detention officer (point of error 73); Lieutenant Fullwood's testimony about the coded phone calls between Appellant and Hart, during which they discussed personal information about the lead prosecutor in this case (point of error 74); and either the CD containing the recordings of the coded phone conversations or Detective Williams's testimony about those phone conversations (point of error 75).

As for the remaining lack-of-notice points, numbered 69 through 75, Appellant recounts what happened at trial, reciting his trial objections to the challenged exhibit or testimony. While Appellant refers to the State's statutory obligation to provide notice here, he does not substantively analyze how the State failed to give adequate notice of the challenged evidence. Further, neither Appellant's conclusory statements nor his attempt to incorporate arguments from other points of error (which were themselves inadequately briefed) provide a substantive legal analysis of the trial court's rulings. Appellant does not apply the relevant law to the facts of his case. *See Swearingen*, 101 S.W.3d at 100.

We overrule points of error 69 through 75.

## XI. DENIAL OF MISTRIAL MOTIONS

In points of error 92 through 97 Appellant contends that the trial court erred by denying various motions for mistrial.[39] They are inadequately briefed. *See* TEX. R. APP. P. 38.1(i). His conclusory statements offer no legal analysis of the trial

---

[39] These motions for mistrial were based on: the State's questioning of Detective Billingsley about whether he "[got] to the truth" in this case (point of error 92); Detective Jeter's purportedly unresponsive answer when questioned about the thoroughness of the criminal investigation (point of error 93); Lynch's testimony about the car-ramming incident with Appellant's ex-wife and about Appellant losing his job (points of error 94 and 95); and a question the State propounded to Almeda Gilbert concerning whether she had conversations with Shanta Crawford about Tiffany (point of error 96). Appellant also contends that the trial court erred in denying his omnibus motion for mistrial based on cumulative errors (point of error 97).

court's rulings. He fails to apply the law to the facts. *See Swearingen*, 101 S.W.3d at 100. *See id.* His conclusory statement—that he was denied due process—does not substantively analyze how the trial court erred in denying his mistrial motions or how their denials violated his right to due process.

We overrule points of error 92 through 97.

## XII. JURY CHARGE ERROR

Appellant raises two points of error asserting error in the trial court's jury charge at both the guilt and punishment phases of trial. Both are multifarious.

## XII.A. Guilt-Phase Complaint

In point of error 116, Appellant complains about the guilt-phase jury charge, cutting and pasting from a set of written objections he filed in the trial court. In the designated argument section, he propounds various legal statements and "reurges his arguments made in the trial court" about the Penal Code definitions of "intentional" and "knowing," contending that "[c]onduct that is reasonably certain to cause death is not the same as an intentional killing." He then asserts:

- "The charge submitted, as a whole, failed to ensure the high reliability of jury fact finding required by the Eighth Amendment in a proceeding that may lead to the imposition of death as a penalty."

- "The Court failed to clearly charge the jury whether an intentional killing was required to support a conviction for capital murder so as to ensure meaningful appellate review of the process potentially leading to a death sentence."

- "The failure to submit a jury charge under Article 38.23 of the Code of Criminal Procedure based upon illegal search of Appellant's vehicle [was error]."

- "[T]he omission of the word 'unanimously' in the verdict form . . . fails to insure [sic] the high reliability of the Jury consistent with the 8th Amendment to the U.S. Constitution. It also fails to protect Appellant's rights to due process under the 5th and 14th Amendments, as well as Article 1, Sections 10, 13 and 19 of the Texas Constitution, protection against cruel and unusual punishment as guaranteed by the 8th Amendment."

- "The trial court erred in failing to require the State to prove beyond a reasonable doubt that Appellant 'intentionally' caused the death of [A.L.]."

This point of error is multifarious because it relies on multiple legal theories. *See Davis*, 329 S.W.3d at 803; *Mays*, 318 S.W.3d at 385. Further, it is inadequately briefed because it does not cite or apply the standard for reviewing jury charge error. *See* TEX. R. APP. P. 38.1(i); *see Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g) (setting forth standards of appellate review for jury charge error). Nor does he explain how he suffered harm from any purported error. He merely repeats his written objections at trial.

We overrule point of error 116.

## XII.B. Punishment Charge

In point of error 131, Appellant complains that the trial court submitted the two statutory special issues to the jury without defining "probability," "continuing

threat to society," "criminal acts of violence," "personal moral culpability," or "moral blame worthiness." He asserts that "these terms are so vague and indefinite as to be violative of Appellant's fundamental constitutional rights" and that their structure is "fundamentally flawed and therefore, unconstitutional." He then states, "The Texas Death Penalty Scheme Violated Appellant's Rights Against Cruel and Unusual Punishment, an Impartial Jury and to Due Process of Law under the Sixth, Eighth and Fourteenth Amendments Because of Vague, Undefined Terms in the Jury Instructions at the Punishment Phase of the Trial."

Appellant acknowledges that this Court has previously rejected similar claims but suggests that the Supreme Court "requires reconsideration of these issues." *See United States v. Davis*, 588 U.S. 445, 470 (2019). He "submits that the complained-of phrases in Art. 37.071 are unconstitutionally vague and violate due process" which "results in more unpredictability and arbitrariness than the due process clause tolerates."

This point of error is multifarious and inadequately briefed.

It is multifarious because it purports to complain of jury charge error while also challenging the constitutionality of the death penalty statute and asserting multiple legal bases for the trial court's purported error. *See Davis*, 329 S.W.3d at 803; *Mays*, 318 S.W.3d at 385.

It is inadequately briefed because it does not analyze how the trial court erred in denying any specific objection or requested instruction. *See Swearingen*, 101 S.W.3d at 100. Although Appellant urges us to reconsider our prior holdings based on *United States v. Davis*, he fails to explain how that opinion affects our prior holdings or why it compels us to reconsider our precedent.[40]

We overrule point of error 131.

## XIII.  IMPROPER JURY ARGUMENT

In point of error 117, Appellant complains that the State's guilt-phase argument was an improper "victim impact style argument."[41]  He states that the

---

[40] *United States v. Davis* held that one prong of a federal statute's definition of "crime of violence"—felonies that by their nature involved a substantial risk of physical force in the course of their commission—was unconstitutionally vague because it offered "no reliable way to determine which offenses [qualified] as a crimes of violence" and depended "on a judge's estimation of the degree of risk posed by a crime's imagined 'ordinary case.'" *Davis*, 588 U.S. at 448, 453.  The offending prong did not "ask about the risk that 'a particular crime posed' but about the risk that an 'offense . . . by its nature, involves.'" *Id.* at 466.

[41] During closing argument, the prosecutor told the jury, "Tiffany was supposed to send her baby to kindergarten, she was supposed to have had first day of school, she was supposed to have had kindergarten graduation."  Appellant objected and, at the bench, asserted, "Judge, this is argument.  It's not evidence.  It's argumentative.  For a punishment-type argument affects the crime, so we would object to the prejudicial nature of this argument.  It is improper, it outweighs the probative [sic] and it's going into improper argument."  The trial court overruled the objection and granted Appellant a running objection.  The prosecutor then resumed her argument, stating,

> She was supposed to have T-ball.  She was supposed to have -- she was supposed to have high school graduation.  She was supposed to get to be the mom of the groom when [A.L.] got married.  She was supposed to get to do a lot of things.  This is what she's got.  A beautiful, bright-eyed baby boy, dead on the floor with a rope dug in his neck.

argument "was manifestly improper and extreme in nature and injected new facts (outside the record) that were harmful to the accused into the trial proceedings." He argues that his "right to a fair trial was abridged by this improper argument." While Appellant identifies the argument he finds objectionable and provides some law about proper jury argument, he presents neither context nor analysis. This point inadequately briefed. *See* TEX. R. APP. P. 38.1(i); *see Swearingen*, 101 S.W.3d at 100; *see also Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (establishing three-factor test for assessing harm from improper jury argument made during guilt phase).

We overrule point of error 117.

## XIV. CHALLENGES TO DEATH PENALTY STATUTE

In points of error 132 through 140, Appellant asserts various constitutional challenges to the Texas capital murder statutory scheme. [42] These points are all

---

[42] Points of error 132 through 137 complain that the trial court erred in refusing to declare Article 37.071 unconstitutional due to "the submission of a future dangerousness special issue" (132); "the submission of a mitigation special issue" (133); "it allow[ing] juries to decide future dangerousness based solely on the facts of the convicting crime" (134); its "definition of mitigating evidence" imposing a "nexus limitation" (135); "fail[ure] to require that mitigation be considered" (136); and its use of the "10-2 Rule" (137).

Points 138 and 139 further complain that "the trial court erred in denying Appellant's constitutional challenges to the…death penalty law" (138) and "[Article 37.071] is…in violation of the due process requirements of the Fourteenth Amendment because it implicitly puts the burden of proving the mitigation special issue on Appellant…." (139).

(continued ...)

inadequately briefed, and points 138 and 139 were not preserved. Appellant offers

no legal analysis of the trial court's error in refusing to declare the statute

unconstitutional. *See* Tex. R. App. Proc. 38.1(i). Moreover, as Appellant

acknowledges, we have previously overruled these and similar claims. [43] He offers

no reason to revisit those holdings. Appellant gives only conclusory statements—

not substantive legal analysis—in support of his arguments. These points are,

therefore, inadequately briefed. *See Swearingen*, 101 S.W.3d at 100.

Furthermore, Appellant offers no record citation showing that he preserved

points 138 and 139 in the trial court. *See* TEX. R. APP. P. 33.1(a)(1)(A); *see also*

*Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009) (concluding that "a

---

Point 140 complains that the cumulative effect of points 132 through 139 "violated Appellant's Fifth, Eighth, and Fourteenth Amendment rights."

[43] *See, e.g., Buntion v. State*, 482 S.W.3d 58, 105–06 (Tex. Crim. App. 2016) (rejecting claim that future dangerousness special issue is "constitutionally infirm under the Eighth and Fourteenth Amendments" because capital juries cannot accurately predict future dangerousness); *Mays v. State*, 318 S.W.3d 368, 396 (Tex. Crim. App. 2010) (confirming that statutorily required instruction defining "mitigating evidence" does not unconstitutionally limit jury's consideration of mitigation evidence); *Martinez v. State*, 327 S.W.3d 727, 740 (Tex. Crim. App. 2010) (observing that Court has consistently held that circumstances of offense itself, if severe enough, may be sufficient to support affirmative finding to future dangerousness special issue); *Coble v. State*, 330 S.W.3d 253, 296 (Tex. Crim. App. 2010) (rejecting claim that definition of "mitigating evidence" is unconstitutional because it imposes "nexus" requirement); *Williams v. State*, 301 S.W.3d 675, 694 (Tex. Crim. App. 2009) (rejecting claim that mitigation issue unconstitutionally permits "the very type of open-ended discretion condemned in *Furman*"); *Leza v. State*, 351 S.W.3d 344, 362 (Tex. Crim. App. 2011) (upholding constitutionality of "10-12 rule").

defendant may not raise for the first time on appeal a facial challenge to the constitutionality of a statute").

We overrule points of error 132 through 140.

## XV.  CUMULATIVE ERROR

In point of error 143, Appellant contends that "the trial court's erroneous rulings throughout the trial deprived [him] of his right to a fair trial."  He lists an abbreviated summary of the "numerous erroneous rulings" that he identified in his brief.[44]  In the designated argument section, he cites some law concerning cumulative error and asserts:

> Errors were committed throughout the trial process – which deprived Appellant of a fundamentally fair trial.  This is a violation of due process. Those errors were not harmless beyond a reasonable doubt.  In light of the cumulative errors, Appellant's death penalty sentence must be set aside.

(Internal citations omitted.)

---

[44]  Specifically, Appellant states that he "has identified numerous erroneous rulings which took place throughout the trial," including:

> denial of a speedy trial; denial of a change of venue; voir dire issues (challenges for cause / errors based on race, or gender); failing to disqualify the prosecutor's office; refusing to suppress evidence (Appellant's car and cellphone)[;] denial of every motion for continuance; allowing expert testimony regarding the "LR" likelihood ratio of a DNA analysis which could not establish that Appellant's DNA was "included" on forensic evidence; admitting extraneous bad acts; allowing evidence obtained in violation of Appellant's Sixth Amendment right to counsel and *Massiah v. U.S.*; allowing expert testimony regarding future dangerousness; denial of confrontation and cross-examination of witnesses; failing to grant Appellant's objections and requests for jury charges; [and] failing to grant mistrials.

Appellant has inadequately briefed this point of error. *See* TEX. R. APP. P. 38.1(i). It repeats in abbreviated form claims raised in his previous points of error. He presents nothing more than conclusory statements devoid of legal analysis. *See Swearingen*, 101 S.W.3d at 100.

Moreover, because Appellant failed to demonstrate error in any of his preceding one hundred and forty-two points of error, we cannot conclude that cumulative error exists. *See Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009) (noting that we have never found that 'non-errors may in their cumulative effect cause error.'") (quoting *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) (internal citation omitted)).

We overrule point of error 143.

## XVI. CONCLUSION

We affirm the trial court's judgment of conviction and sentence of death.


Delivered: April 16, 2026

Do Not Publish